[No. C011580. Third Dist. Mar. 12, 1992.]

PEGGY J. CLAYPOOL et al., Petitioners, v.
PETE WILSON, as Governor, etc., et al., Respondents.

**COUNSEL**

Gary Reynolds, Howard Schwartz, Anne Stausboll, Margie Valdez, Maureen C. Whelan, William Corman, Davis, Reno & Courtney, Alan C. Davis, Deborah L. Shibley and Dennis F. Moss for Petitioners.

Joan R. Gallo, City Attorney (San Jose), Susan Devencenzi, Deputy City Attorney, Nancy A. Williams, Mark A. Madsen, Kevin A. Howard, McDonough, Holland & Allen, William C. Hilson, Jr., Diepenbrock, Wulff, Plant & Hannegan, Steven H. Felderstein, George Kim Johnson, Sigman & Lewis, Dan Feinberg, Jeffrey Lewis, Carlos Resendez, Groce, Locke & Hebdon, Crofts, Callaway & Jefferson, Sharon E. Callaway, W. Bebb Francis III, James Q. Shirley, Sheehan, Phinney, Bass & Green, Alan P. Cleveland and Charles F. Conrad as Amici Curiae on behalf of Petitioners.

Daniel E. Lungren, Attorney General, N. Eugene Hill, Assistant Attorney General, Ramon M. de la Guardia, Cathy A. Neff, Daniel G. Stone and Richard Thomson, Deputy Attorneys General, Hufstedler, Kaus & Ettinger, Joseph L. Wyatt, Jr., Michael V. Toumanoff, John W. Alden, Jr., Lawrence E. Gercovich, D. Robert Shuman, Richard J. Chivaro and Larry W. Kreig for Respondents.

OPINION

BLEASE, J.—In this original mandamus proceeding members of the Public Employees' Retirement System (PERS) and their employee organizations (collectively Petitioners), challenge the constitutionality of two parts of chapter 83 of the Statutes of 1991 (Chapter 83). One part repeals three funded supplemental cost of living (Cola) programs and directs that the funds be used to offset contributions otherwise due from PERS employers. The other transfers the responsibility for actuarial determinations from the PERS board to an actuary acting under a contract with the Governor.

Petitioners and their allies, the nominal respondent Board of Administration of PERS (PERS Board) and amici curiae, contend that repeal of the supplemental Cola programs and reallocation of the funds to offset employer contributions unconstitutionally impair the contract rights of PERS beneficiaries and, along with the transfer of actuarial functions, violate California Constitution, article XVI, section 17, which declares that the assets of a public pension or retirement system are trust funds.

The heart of the controversy has two chambers. One concerns the permissible uses of a unique fund within PERS amounting to some $2 billion. The fund was generated from earnings on the investment of mandatory payroll contributions of employee members of the system. Ordinarily, such earnings are accumulated to meet the basic pension obligations of the state (State) and other PERS employers. Some were diverted to fund supplemental Cola benefits to retirees to aid in the preservation of the purchasing power of their pensions. Under Chapter 83 the statutes providing for the supplemental Colas are repealed, a new supplemental Cola program enacted, and the funds reallocated to meet the basic pension obligations of PERS employers.

Petitioners claim that this reallocation of investment earnings impairs the vested contract rights of PERS members. We will conclude that no contract rights are impaired. The principal beneficiaries of the fund, if not reallocated, are former employees who ceased employment prior to the time when an implied statutory promise not to reallocate the fund could have arisen. They earned no vested contract rights under the repealed statutes and must rely, along with present employees, upon a new supplemental Cola program enacted by Chapter 83 as a replacement for the repealed programs. The employees who may have earned vested contract rights by rendering service under the repealed statutes are given comparable advantages under the new supplemental Cola program and for that reason their rights are not unconstitutionally impaired.

The second chamber of the controversy concerns the transfer of PERS Board actuarial functions to an actuary selected by the Governor (the

Actuary). The key issue is whether the assignment of these matters to an outside actuary violates the requirement of California Constitution, article XVI, section 17, that PERS be managed as a trust. We will conclude that Chapter 83 contains safeguards which insulate the Actuary from the control of the Governor and that the transfer of actuarial functions is not facially inconsistent with trust law.

We will deny the petition.

### FACTS AND STATUTORY BACKGROUND

The facts for the most part are contained in the history of the Public Employees' Retirement Law and matters subject to judicial notice. (See *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 780 [189 Cal.Rptr. 212]; *California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 500, fn. 2 [202 Cal.Rptr. 611].) Our point of departure is the opinion of this court in *Valdes* v. *Cory*. There, we recounted the history of PERS to March 1982, the date of the enactment challenged in that case. (139 Cal.App.3d at pp. 780-783.) We will revisit this history before relating subsequent developments. Except as we note, the statutes governing PERS have been substantially carried forward to the present.

### A. PERS History Prior to 1982

In 1931 the Legislature established the State Employees' Retirement System, presently known as PERS. (Stats. 1931, ch. 700, § 25, p. 1444; Gov. Code, § 20004.)[1] The system included a fund derived from mandatory employee payroll contributions (member contributions), contributions of the state, and earnings on the investment of the fund. (Stats. 1931, ch. 700, §§ 41, p. 1445, 63, p. 1448, 65-74, pp. 1448-1451.) The member contributions were calculated to provide an average annuity at age 65 equal to one 140th of a member's final compensation multiplied by the years of service. (*Id.*, § 65, p. 1448.) These contributions were deducted from the payroll of each office or department and the remaining salary payment was declared a full and complete discharge of the obligation owed an employee except for claims of benefits under the retirement law. (*Id.*, § 67, p. 1450.)

The system was administered by a board of administration. At the outset the PERS Board was directed to make actuarial valuations of the fund and the liabilities of the system and to recommend to the Legislature appropriate changes in the rates of contribution to achieve equality between valuation

---

[1]References to a section are to the Government Code unless otherwise specified.

and liabilities. (Stats. 1931, ch. 700, §§ 51, p. 1447, 58, pp. 1447-1448, 69-72, pp. 1450-1451.)

Each year the PERS Board was to credit member contributions with 4 percent interest or such greater amount of interest as it deemed proper in light of the earnings on the fund in that year, but no more than actual earnings. (Stats. 1931, ch. 700, § 52, p. 1447.) An individual member account was kept for each member of the retirement system and was credited with the member's payroll contributions and with annual interest. (*Id.*, § 67, p. 1450.) The records and accounts of the PERS Board were directed to show the accumulated contributions of the State. (*Id.*, §§ 56-57, p. 1447.) If a member discontinued employment other than by death or retirement the member was to be paid the amount of his or her accumulated member contributions. (*Id.*, § 75, pp. 1451-1452.) A member was entitled to retire at age 60 with 20 years of service and to receive a retirement allowance consisting of an annuity equal to the value of the accumulated employee contributions together with a matching pension funded by the state contributions. (*Id.*, §§ 79-82, p. 1452.)

In 1937 a reserve against deficiencies was created. "Income, of whatever nature, earned on the retirement fund during any fiscal year, in excess of the interest credited to contributions during said year shall be retained in said fund as a reserve against deficiencies in interest earned in other years, losses under investments, and other contingencies." (Stats. 1937, ch. 806, § 8, p. 2284; see now § 20203.) In 1939 the system was expanded to include any municipal corporation in the State which elected to contract with the PERS Board for coverage of its employees. (Stats. 1939, ch. 927, § 3b, p. 2605.) The law was also amended to provide that interest at the current rate rather than 4 percent should be the baseline credit to member contributions. (*Id.*, § 13, p. 2611.) In 1943 the system was expanded to include any public agency in the State which elected to contract with the PERS Board for coverage of its employees. (Stats. 1943, ch. 640, p. 2259.)

In 1945 the original enactments were repealed but the provisions in essential part were carried over as the State Employees' Retirement Law. (Stats. 1945, ch. 123, §§ 1-2, pp. 535-609; §§ 20000-21455.) In 1947 the pension component of the retirement allowance was defined to be the amount, which when added to the annuity component, met prescribed target amounts based on age at retirement and final compensation. (Stats. 1947, ch. 732, § 4, pp. 785-786.) Under the present version of this provision, for example, a state miscellaneous member retiring at age 60 with 25 years of service is entitled to a retirement allowance of 2 percent of final compensation multiplied by the number of years of service, i.e., half-pay.

(§ 21251.13.) This allowance is increased annually by a basic Cola limited to 2 percent per year. (§§ 21222, 21224.) Some other classifications of members have a higher basic Cola.

In the early years of the system the reserve against deficiencies was not substantial. "For years, the interest credited to accumulated contributions closely paralleled the actual earnings rate after deduction of administrative costs. Until 1971, the crediting rate was usually within one quarter of one percent of the earnings rate. In recent years, however, the crediting rate has not kept pace with market rates of interest, resulting in a dramatic increase in the reserve account because of current record-high investment yields in financial markets. Consequently, the PERS currently [1982] has a reserve approaching $1 billion." (*Valdes* v. *Cory, supra*, 139 Cal.App.3d at p. 783.)

A consequence of the burgeoning reserve for deficiencies was the enactment of former section 21231 in 1980 (Stats. 1980, ch. 1244, § 1, p. 4219). It established a special account within PERS and transferred from the reserve for deficiencies to the account monies exceeding 2 percent of PERS assets. (*Ibid.*) The purpose of this account was to increase by 10 percent for the period October 1, 1980, through September 30, 1982, the monthly allowance of every person eligible to receive an allowance on December 31, 1979. (*Ibid.*) We adopt the usage of the parties and refer to this benefit as the "Boatwright benefit." Subdivision (c) of section 21231 provided that recipients of this benefit are to be informed that "the increases are not cumulative and shall not be included in their base allowance and may be available for only a limited period of time."

In March 1982, chapter 115 was enacted. The provisions of this enactment, challenged in *Valdes* v. *Cory*, directed that employer contributions payable for a portion of that year not be paid and that the PERS Board make up the shortfall by transfer of an equivalent sum from the reserve against deficiencies. (Stats. 1982, ch. 115, §§ 14, subd. (b), p. 344, 58-61, pp. 370-371.) The PERS Board adopted a resolution declining to make this transfer until compelled so to do by a final judgment of an appellate court. (*Valdes* v. *Cory, supra*, Cal.App.3d at p. 779.) This led to the *Valdes* v. *Cory* litigation.

### B. Chapter 330 of the Statutes of 1982

In June 1982, chapter 330 was enacted. Section 1 states the legislative intent of the enactment in pertinent part as follows:

"It is the intent of the Legislature in enacting this act to preserve the actuarial integrity of the Public Employees' Retirement System, to recognize

the fiduciary role of the Board of Administration of the Public Employees' Retirement System, to assist in the orderly and equitable disposition of the reserve against deficiencies created by Section 20203 of the Government Code, and to provide for repayment of state and school employer retirement contributions. In enacting this act, the Legislature agrees with the findings of the chief actuary and the board, who, on June 16, 1982, determined that funds in the reserve for deficiencies may be allocated from the reserve without jeopardizing the actuarial soundness of the system. The Legislature also concurs with the board's finding that direct relief from contributions in this time of fiscal stress is for the exclusive benefit of the members and retired members of the system." (Stats. 1982, ch. 330, § 1, pp. 1617-1618.)

Under chapter 330, former section 20203 was amended to provide in pertinent part: "At the end of each fiscal year, the amount in the reserve against deficiencies which exceeds 1 percent of the total assets of the system shall be credited to other accounts as prescribed by this part." (Stats. 1982, ch. 330, § 14, p. 1622.) Chapter 330 also enacted several notable statutes governing PERS. Section 20131.1 requires the PERS Board to credit employer contributions with interest at the current net earnings rate. (Stats. 1982, ch. 330, § 12, p. 1621.) Section 21232 requires the board to transfer $130 million from the reserve for deficiencies to a special account to pay Boatwright benefits for an additional two years. (Stats. 1982, ch. 330, § 29, p. 1626.) The Boatwright benefit has been extended subsequently with pourover funding from the Investment Dividend Disbursement Account, which we next explain. (Stats. 1984, ch. 671, § 1, pp. 2465-2466; Stats. 1985, ch. 1495, § 3, pp. 5504-5505; Stats. 1988, ch. 1356, § 3, pp. 4491-4492.)

Section 21235 requires that the PERS Board establish an Investment Dividend Disbursement Account (Investment Dividend Account) for the purpose of increasing retirement allowances to an amount equal to 75 percent of their original purchasing power. (Stats. 1982, ch. 330, § 30, pp. 1624-1627.) The Investment Dividend Account is funded by the residue from earnings after deducting system administration costs, funding the reserve against deficiencies to 1 percent of total assets, and crediting interest to member accounts. (Stats. 1982, ch. 330, § 30, pp. 1626-1627.) Member contributions are credited at the current actuarial interest rate. The PERS Board is required to notify recipients of this benefit that "the increases are not cumulative, not part of the base retirement allowance, and may be available for only a limited period of time and that the board may discontinue the increases." (Stats. 1982, ch. 330, § 30, pp. 1626-1627.) Chapter 330 also provides that the authorization to pay increased allowances from the Investment Dividend Account under section 21235 was to expire on January 1, 1989. (Stats. 1982, ch. 330, § 30, pp. 1626-1627.)

## C. Chapter 1356 of the Statutes of 1988

Statutes of 1988, chapter 1356 reconfigured the Investment Dividend Account program. Section 20203 was amended to reduce the maximum size of the reserve against deficiencies to 0.30 percent of system assets. The Investment Dividend Account was set at a fixed amount and drew interest at the rate used to credit retired member reserves. (§ 21237.) The remaining funds available under the allocation formula of section 21235 were retained in so-called Purchasing Power Accounts. (§ 21237.) The funds in these accounts were used to pay Boatwright benefits and other purchasing power benefits. (§§ 21235-21236.) The Investment Dividend Account supplemented the Purchasing Power Accounts to pay these benefits. (§ 21235.)

Chapter 1356 also established the Extraordinary Performance Dividend Account (Extraordinary Performance Account). Section 21238 permitted the PERS Board, in years in which the 75 percent of purchasing power goal was met by payments from the Purchasing Power Accounts, to raise pensions to a higher common minimum purchasing power level. The first payment from the Extraordinary Performance Account occurred in January 1991, and under the policies adopted by the PERS Board, brought all allowances up to 80 percent of original purchasing power. Payments under this program were paid by a separate warrant and recipients were notified "that the payments are not cumulative, not part of the base retirement allowance, and may be available only as a result of extraordinary investment returns to the system." (former § 21238.)

The Extraordinary Performance Account was funded by pourover funds from the Purchasing Power Accounts consisting of the amount, not to exceed the amount disbursed in the preceding fiscal year, remaining after disbursements were credited to retired member accounts from any funds in excess of those disbursed pursuant to sections 21235 and 21236 for Boatwright benefits and purchasing power allowances in the four preceding years. (§ 21237, subd. (b).) Petitioners concede that the funds, credited to retired member accounts, became employer asserts for purposes of the effect on the employers' contribution obligations, since they were available to make up part of the ordinary retirement allowance.

## D. Chapter 83 of the Statutes of 1991

That brings us to Chapter 83 of the Statutes of 1991, which is the subject of Petitioners' challenge. This enactment repeals the statutes providing for the Boatwright benefit, the 75 percent of purchasing power floor, and the Extraordinary Performance Account benefit (collectively former supplemental Colas). (Stats. 1991, ch. 83, §§ 35, 37, 39, 40.) The funds allocated for

these benefits are to be used to "reduce employer contributions in fiscal year 1991-92 and subsequent fiscal years until those amounts are depleted." (§ 20131.01.)

In place of the repealed programs section 21235.5 enacts an alternative Cola program, as follows:

"(a) On an annual basis, the board shall transfer the lesser of: (1) the amount necessary to increase all monthly allowances paid by the system to 75 percent of the purchasing power of the initial monthly allowances; or (2) up to 1.1 percent of the net earnings on member contributions, as determined by Section 20132.6, to a supplemental account.

"(b) The funds so transferred to the supplemental account shall be utilized to increase all monthly allowances paid by the system up to a maximum of 75 percent of the purchasing power, as determined by the actuary, of the initial monthly allowances that were received by every retired person or survivor or beneficiary of a state, school or local member or retired person who was eligible to receive any allowance at the end of each fiscal year. Funds remaining in the account after the payment of benefits under this section shall be transferred to the employer accounts." (Stats. 1991, ch. 83, § 36.)

Chapter 83 also transfers many of the actuarial duties previously assigned to the PERS Board to the Actuary. Section 20006 provides:

"(a) 'Actuary' means an individual or firm practicing as an enrolled consulting actuary appointed by the Governor under contract with the Governor's Office. The contract shall not be subject to any provisions of law relating to competitive bidding. The contract shall be for a fixed period of time not to exceed three years as determined by the Governor. The compensation paid to the actuary and other necessary employees of the actuary shall be fixed by the contract. The actuary under contract with the Governor's Office pursuant to this section may not be awarded a successive contract. All costs of the contract for the actuary shall be paid from the retirement fund on an annual basis. In carrying out duties under this part, the actuary shall be deemed to succeed to and assume the fiduciary obligations pertaining to actuarial determinations previously held by members of the board, including, but not limited to, those set forth in Section 17 of Article XVI of the California Constitution.

"(b) The Governor shall submit the name of the actuary to each house of the Legislature. The actuary shall commence serving in office on the day

after receipt of confirmation by both houses of the Legislature. However, the appointment shall become effective and be deemed confirmed the 61st calendar day after the submission of the nomination unless a majority of either house affirmatively rejects the nomination. If the 60-day period ends during a recess of the Legislature, the period is extended to the sixth day following the date on which the Legislature reconvenes." (Stats. 1991, ch. 83, § 5.)

Under the statutes enacted by Chapter 83 the Actuary, among other things, values the liabilities and assets of PERS (§ 20006.1), adopts the annual interest rate and the actuarial interest rate (§§ 20026.1, 20026.2), and determines the employer contribution rates (§ 20750.905).

Additional facts will be introduced at appropriate points in the discussion of the contentions made by the parties.

DISCUSSION

*Introduction*

We address the most forceful of the arguments advanced by Petitioners and their allies, the PERS Board and the numerous amici curiae, without separate attribution.[2] In the voluminous briefings there are numerous arguments which we will not relate or discuss. Many of them are addressed to the wisdom of Chapter 83, a topic outside our purview. (See, e.g., *Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 780.) Other arguments are simply overtaken or outflanked by resolution of the matters which we do discuss or do not warrant discussion because they are too fragmentary or obscure. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 479.)

Petitioners and their allies challenge the validity of the repeal of the former supplemental Cola programs and the reallocation of the monies made available thereby to offset the payment obligations of PERS employers. They claim that all members of the retirement system have contractual rights to the benefits of the repealed programs which have been unconstitutionally impaired by their repeal and replacement by a Cola program which does not provide comparable benefits. Failing that argument they claim that the monies which funded the repealed programs are held in trust for PERS members and cannot be used to offset the obligations of PERS employers. They also challenge the transfer of the PERS Board actuarial duties to an actuary selected by the Governor. We will answer these claims in the following ways.

---

[2]Petitioners have expressly adopted and incorporated the arguments of their allies.

We begin by assuming that the statutes which created the former supplemental Colas establish contractual rights which may not be altered except by replacement with a program establishing comparable benefits. Our assumption does not extend to PERS members who retired prior to the effective dates of the former programs because they did not exchange their labors for the benefits created after retirement and for that reason gained no vested contractual rights to them. This circumstance affects the comparability of the new Cola program because the former employees are the principal beneficiaries of the repealed programs.

A significant feature of the repealed programs is that their benefits were limited by the amounts in the fund out of which they were to be paid. If the funds declined so did the benefits which they funded. A significant provision of Chapter 83 is that it creates a "second tier" of pension benefits for new employees, who do not make member contributions. The validity of that provision determines whether the new Cola program provides benefits which are comparable to those afforded under the repealed supplemental Cola programs. Since the repealed and new Cola programs must be similarly judged the benefits provided by the repealed programs must be viewed as if modified by the creation of a second tier of noncontributory employees. So viewed, the fund out of which the former supplemental Colas would have been paid would have ceased to grow and would have been largely consumed by payments to retired members lacking vested contractual rights to the benefits paid by the fund. We determine that the Legislature could validly amend the statutes governing PERS by the addition of a second tier of noncontributory employees, the effect of which would have been to erase the benefits to members with vested rights in the former supplemental Cola programs. For that reason the new Cola program provides an obvious new advantage for such members, actual benefits for the theoretical but illusory higher benefits under the repealed programs.

Petitioners and their allies nonetheless argue that because the fund made available by the repeal of the former supplemental Cola programs is held in trust for the benefit of PERS members it may not be used to defray employer contributions which otherwise would be required. We conclude that although the fund must be committed to the payment of PERS trust benefits, since the repeal of the former supplemental Cola programs makes available monies not previously counted toward the actuarial soundness of the trust fund, they may be counted so as to offset PERS employer obligations until employer contributions are again required for actuarial soundness. Counted in this manner the funds remain committed to the payment of PERS trust benefits.

Petitioners and their allies claim that the provisions of section 20006, which transfer the PERS Board actuarial duties to an actuary selected by the

Governor, violate article XVI, section 17 of the California Constitution which declares that PERS assets are trust assets. They assert, and we assume, that this provision constitutionalizes the law of trusts. Section 20006 provides that the Actuary must "assume the fiduciary obligations . . . previously held by members of the [PERS] board, including . . . those set forth in Section 17 of Article XVI of the California Constitution." (§ 20006, subd. (a).) Because Petitioners challenge the validity of section 20006 on its face we are constrained by the limited scope of judicial review appropriate to such a challenge to rule out conjecture predicated upon hypothetical applications of the statute. We will conclude that there is nothing in section 20006 which facially precludes the Actuary from complying with its direction to comply with the "fiduciary obligations [imposed by] Section 17 of Article XVI of the California Constitution."

I

*The Repeal of the Former Supplemental Cola Statutes Does Not Impair*
*Vested Rights of Contract*

█ Petitioners challenge the reallocation of the funds committed to the former supplemental Cola programs to defray PERS employer funding obligations. We first address the predicate contention that the repeal of the statutes establishing the former supplemental Cola programs unconstitutionally impairs rights of contract. If that contention is successful the remaining claims are moot. If the repeal of these statutes is invalid the funds allocated to the former supplemental Colas are not available to defray the employer funding obligations.

█ The basic doctrines governing pension rights are set out in the following passage from *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859 [148 Cal.Rptr. 158, 582 P.2d 614]:

"A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity. The employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension'. . . .

". . . 'An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. Such modifications must be reasonable,

and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.'" (*Id.* at pp. 863-864, citations and italics omitted; also see Annot., Vested Right of Pensioner to Pension (1957) 52 A.L.R.2d 437, 444-450 for a synopsis of California case law.)

### A. Only Persons Employed After January 1, 1989, Could Have Vested Rights to Former Cola Benefits

■ Petitioners and the Governor join issue on the question whether the former supplemental Colas vest contract rights to pension benefits in *anyone* within the meaning of *Betts.* The Governor claims that the peculiar character of these programs distinguishes them from the statutory entitlements which were the subject of the cases in which the vesting rule developed. He relies upon two primary considerations: (1) that the benefits are expressly conditioned upon the sufficiency of a fund for which there is no promise of actuarial soundness, and (2) that the former supplemental Cola statutes contain admonishments to recipients that future benefit payments are not assured. Petitioners reply that the fact that benefits are subject to a condition only limits vesting to the circumstances addressed by the condition and that the admonitions only inform the beneficiaries of the condition.

■ At the outset it is useful to resolve a subordinate vesting question, whether members who ceased employment prior to the enactment of the former supplemental Colas have vested rights in their continuance. Petitioners' initial arguments fuse the interests of these members (former employees) with those employed after their effective dates (present employees).

The contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute. (See, e.g., *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d at p. 506.) A member whose employment terminated before enactment of a statute offering additional benefits does not exchange services for the right to the benefits. We asked the parties whether these former employees have vested rights.

Petitioners first claim that once new pension benefits are made applicable to retired persons they may not be taken away, relying upon *Terry* v. *City of Berkeley* (1953) 41 Cal.2d 698, 702 [263 P.2d 833] and *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180 [265 P.2d 884]. The cases are inapposite. *Terry* did not address the question. It concerned the construction of ambiguous

language in a pension ordinance applicable at the time the plaintiff retired for a physical disability incurred in the line of duty. (41 Cal.2d at p. 699.) The court construed the language in favor of the retiree, holding that an attempt to cure the ambiguity by an amendment of the ordinance "more than four years after the plaintiff retired" was ineffectual. (*Id.* at pp. 702-703.) For the same reason *Wallace* is inapposite. It addressed the reasonableness "of an amendment [to the employee's pension plan], made before [the] employee is eligible to retire, which provides for termination of pension rights if he is convicted of a felony after retirement." (42 Cal.2d at p. 184.)

Petitioners' remaining claim of direct support rests on *Olson* v. *Cory* (1980) 27 Cal.3d 532 [178 Cal.Rptr. 568, 636 P.2d 532]. At issue was the validity of the repeal of a statute which resulted in a full Cola for judicial pensioners who had retired before the statute was enacted. The court held that the repeal of the statute was invalid regardless whether the pensioners had earned a vested right in the full Cola by service after its enactment. Petitioners conclude therefrom that benefits given retirees after retirement cannot be reduced regardless whether they earned vested rights to them. Petitioners misread the case.

The holding is predicated upon a vested contract right which the retired member did hold. The right was earned not by service under the Cola statute but by service under a statute which measured retirement rights as a percentage of the salary of the judge's successor in office. If the successor had vested rights to a full Cola adjustment in salary by service after its enactment the pensioner obtained a vested right to a percentage of that salary by virtue of the statute in effect at the time of retirement. The court said: "*Contractually*, each judicial pensioner is entitled to some fixed percentage of the salary payable to the [successor] judge . . . . The resolution of pensioner *vested* rights, then, is dependent on the foregoing resolution of [the successor] judges' vested rights . . . ." (*Olson* v. *Cory, supra*, 27 Cal.3d at pp. 541-542, italics added.) Since the successor judges earned vested rights to the salary called for under the full Cola salary statute, the pensioners' vested contract right to a percentage of that salary rendered its repeal invalid as to them.

■ *Olson* v. *Cory* does not aid Petitioners because the pension rights of PERS members are not tied to their successors' salary. For that reason employees who ended their service prior to the enactment of the former supplemental Cola statutes have no vested right which could be impaired by their repeal. (See 27 Cal.3d at p. 542; *Pasadena Police Officers Assn.* v. *City of Pasadena* (1983) 147 Cal.App.3d 695, 706 [195 Cal.Rptr. 339]; *York Paid Firemens Pension Fund Board of York City* v. *Lindsey* (Pa. Cmwlth. Ct. 1980) 52 Pa. Comwlth. 51 [415 A.2d 441].)

That brings us to Petitioners' claim that former employees obtained a vested right to continuance of the former supplemental Colas because they exchanged another vested right for them. Petitioners suggest that this is a case like *Pasadena Police Officers Assn., supra,* 147 Cal.App.3d 695, which held that employees were entitled to the continuation of a Cola based upon such an exchange. In that case the retirees had earned a contractually vested right to a fixed pension which could not be reduced. A postemployment amendment of the pension ordinance offered these retired employees an option to exchange that vested right for a pension measured by a Cola having the potential of increasing or decreasing the pension by a Cola adjustment. The court held that retirees who elected the Cola provision were protected from repeal of the amendment because their post employment election to exchange benefits created a contract that could not be impaired.

Petitioners argue that former state employees are in an analogous situation because the statutes establishing the former supplemental Colas funded them by reduction of the reserve against deficiencies from 1 percent of PERS assets to 0.30 percent of PERS assets. They claim that the former employees had a vested contract right to a reserve account of 1 percent of PERS assets under our holding in *Valdes* v. *Cory* and suggest that the only manner in which the reduction of the reserve account could have passed constitutional muster is on the theory the pension rights were reasonably modified pursuant to the criteria in *Betts.* They claim that the former supplemental Colas were the comparable new advantage required to offset the disadvantage of reduction of the reserve account.

The analogy to *Pasadena Police Officers Assn.* is inapposite. The former employees made no election (acceptance) of an alternative pension right offered by the employer. No new contract was formed by an exchange. Their claim of right must be founded upon the antecedent contract, entered into prior to retirement, or they have none. As we will show (pt. II, *post,* pp. 670-673), *Valdes* does not hold that there is a vested contract right to a reserve account of 1 percent of system assets. Moreover, retirees, unlike employees, are not subject to the reasonable modification doctrine. (See e.g., *Terry,* 41 Cal.2d at pp. 702-703; *Betts,* 21 Cal.3d at pp. 864-865.) If their contracts had been impaired by the reduction of the reserve account their remedy was a timely action to avert or halt the impairment.

The only arguable claims of vested contractual rights pertain to present employees, members employed after Statutes of 1988, chapter 1356 reconfigured the Investment Dividend Account program. Prior to that enactment the former supplemental Cola programs were subject to expiration by sunset provisions. (See, e.g., Stats. 1982, ch. 330, § 29, p. 1626.) The elapsed

period between these enactments and their sunset dates are such that employees who worked under them would not have reached eligibility for payment of supplemental Cola benefits prior to their expiration.

### B. Reasonable Modification

We need not reach the issue whether members employed after January 1, 1989, are entitled to vested contractual rights in the former supplemental Cola programs. Under California law an " 'employee's vested contractual pension rights may be modified prior to retirement [provided that the] modifications must be reasonable . . . .' " (*Betts, supra,* 21 Cal.3d at p. 864.) Because it poses novel constitutional questions, the resolution of the question of vested rights is more problematic than resolution of the question whether Chapter 83 is a reasonable modification of the prior supplemental Cola programs. If we resolved the vesting question in favor of Petitioners we would nonetheless have to address this latter question. ■ Since constitutional adjudication is eschewed where possible (E.g., *Cumero* v. *Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586 [262 Cal.Rptr. 46, 778 P.2d 174]) we will proceed to the question of reasonable modification, assuming for the sake of discussion that Petitioners would prevail on the vesting question as to persons employed after January 1, 1989.

### 1. The Changes in the Supplemental Colas Bear a Material Relation to the Theory of PERS

■ Under *Betts* a modification of a vested pension right is reasonable only if it "bear[s] some material relation to the theory of a pension system and its successful operation, and changes in [it] which result in disadvantage to employees [are] accompanied by comparable new advantages." (21 Cal.3d at pp. 864-865, italics omitted.)

■ Petitioners first argue that the new supplemental Cola program lacks the requisite relation to the theory of the pension system and its successful operation because the purpose of the enactment is to alleviate a state budget deficit. The Governor argues that the changes provide a more certain source of long-term funding for the supplemental Cola benefits as well as alleviating a deficit. Petitioners suggest that the material relation requirement renders changes made with a purpose of saving the public employer money invalid per se. We disagree.

The saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee. If that were not the case the reasonable modification doctrine

would add little flexibility to the administration of the public pension systems. The "material relation" requirement fulfills "the purpose of keeping the pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system . . . ." (See *Wallace* v. *City of Fresno, supra,* 42 Cal.2d at pp. 184-185.)

The case law which applies the "material relation" requirement is sparse. *Wallace* held that an amendment which terminated all pension rights of a pensioner upon conviction of a felony after retirement did not satisfy that requirement. (42 Cal.2d at p. 185.) "[T]he change was designed to benefit the city and . . . to meet the objections of taxpayers who would be opposed to contributing funds for the maintenance of a pensioner who had been convicted of a felony." (*Ibid.*) In *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 133 [287 P.2d 765], it was held that amendments which increased the employee contribution rate, providing for a fixed pension and requiring a contribution from employees returning from military service, did not bear a relation to the functioning and integrity of the pension system. The city did not claim that the changes were necessary to preserve or protect the pension program or that otherwise it would have difficulty in meeting its pension obligations. (*Ibid.*) It claimed that newer employees, not eligible for the original pension rights, were disgruntled and that to remedy that condition it wished to equalize the compensation of the two groups of employees. (*Ibid.*)

■ *Wallace* and *Allen* show that considerations external to the functioning of the pension system, such as increased taxpayer hostility to felons or jealousy of employees not covered by the system, will not justify a change. The justification must relate to considerations internal to the pension system, e.g., its preservation or protection or the advancement of the ability of the employer to meet its pension obligations. Changes made to effect economies and save the employer money do "bear some material relation to the theory of a pension system and its successful operation . . . ." (*Betts* v. *Board of Administration, supra,* 21 Cal.3d at p. 864.) That is not to say that a purpose to save the employer money is a sufficient justification for change. The change must be otherwise lawful and must provide comparable advantages to the employees whose contract rights are modified. ■ We hold only that the monetary objective will not invalidate a modification which is otherwise valid.

2. *Unless the Second Tier Provision Is Invalid, the New Supplemental Cola Provides a Comparable Advantage in Lieu of the Disadvantage of Lower Maximum Benefits*

Petitioners locate the disadvantage principally in the lowered purchasing power maximums for the new supplemental Cola benefits under section

21235.5.[3] As we next show, the claim fails unless the provision of Chapter 83, which requires that certain state employees hired after the effective date of the statute be placed in a noncontributory pension plan (mandatory second tier) is invalid.

Under the former supplemental Cola programs retirees eligible for Boatwright benefits could receive more than 75 percent of the original purchasing power of their pensions and all retirees could receive more than that level under the Extraordinary Performance Account program. Under new section 21235.5 the maximum level of purchasing power protection is 75 percent. Petitioners originally argued that this is a disadvantage for which there is no offsetting comparable advantage. The Governor replied that comparability does not require point by point equality and suggested that the potential for greater benefits under the repealed statutes is offset by the greater assurance of funding under section 21235.5.

The Governor adduced an independent actuarial report (the Foster-Higgins report), provided to PERS on January 15, 1991, under a contract authorized by former section 20234.[4] He argues that it shows that the accumulated former supplemental Cola funds would have been exhausted in about a decade and that the annual funding mechanism for that program is less reliable and productive than the annual funding mechanism under the new supplemental Cola. The Petitioners challenge both the interpretation and methodology of the report.

The Petitioners adduced expert actuarial opinion testimony supporting the conclusion that if the former supplemental Cola program had continued and had been operated under past policies, its annual funding mechanism would have been more productive than the funding mechanism under the new supplemental Cola. The Governor replied with contrary expert actuarial opinion.

---

[3]Petitioners assert in a reply memorandum that the new supplemental Cola program has the disadvantage of a funding mechanism which generates lower funding in years when the rate of earnings on employee contributions is low. As appears in the text the evidence under the appropriate assumptions shows greater average benefits under the new supplemental Cola program. This is an advantage that compensates for the fluctuations that may occur in poor earnings years.

[4]Former section 20234 (Stats. 1982, ch. 1496, § 5, p. 5798; repealed Stats. 1991, ch. 83, § 26) is as follows: "The board shall annually contract with an independent actuary to analyze and comment on the application of generally accepted actuarial practices to the actuarial assumptions utilized by the board during the preceding fiscal year and the effect of the benefit provided by Section 21235 on employer contribution rates. [¶] A copy of the report shall be filed with each house of the Legislature, the chairman of each affected policy committee, and the Governor at the same time as the report required by Section 20136."

As we have shown, the reasonableness of the modification must be viewed from the vantage point of persons employed on or after January 1, 1989. That has significant consequences for Petitioners' original arguments. Boatwright benefits were available only to persons whose employment terminated prior to the enactment of the program. Therefore no one has vested rights in it.

The loss of the potentially higher level of benefits under the Extraordinary Performance Account program is a disadvantage, but that potential must be evaluated by its actuarial consequences. A person employed on January 1, 1989, was not entitled to receive Extraordinary Performance Account benefits (as the program was administered by PERS) until retirement and erosion of the pension's value to 80 percent of its original purchasing power. That would not occur until nine years after the date of retirement, assuming a 5 percent inflation rate and a basic Cola of 2 percent. For that reason the comparability of the new supplemental Colas to those under the Extraordinary Performance Account must be gauged by the benefits which would accrue for the period beginning in 1998 and extending over the likely duration of their receipt.

In light of this measure of comparability and the conflicting opinion testimony, we asked the parties to compare the projected benefits of a typical, hypothetical present employee under the former and new supplemental Cola programs. Because Chapter 83 has a mandatory second tier under which most new state employees who are miscellaneous and state industrial members of PERS would make no member contributions (§ 20013.75), we asked the parties to factor the absence of such contributions into their calculations of projected benefits under *both* supplemental Cola programs.

The parties adduced evidence in response to our request. The Governor adduced evidence of projected benefits predicated upon a mandatory second tier. This evidence shows that the projected new benefits are likely to be equivalent to or greater than those available under the former program. The Petitioners declined to compare projected benefits on the assumption of a mandatory second tier applicable to the former supplemental Cola programs.[5] They argue that the comparison would be misleading. "The very reason that the [new supplemental Cola] Program fails, when compared to the [former supplemental Cola] Program, is that the [new supplemental

---

[5]The PERS Board also provided sketchy evidence regarding the comparability of benefits in response to our request. That evidence tends to show that "[a]s long as there are sufficient funds to pay [former supplemental Cola] benefits, those payments are larger than the payments provided by [Chapter 83]." However, that begs the question of the effect of a second tier upon the continued availability of funds to pay the supplemental Cola benefits. The PERS Board failed to address that question.

Cola] Program is accompanied by a mandatory second tier, while the [former supplemental Cola] program was not."

It is apparent that Petitioners' claim of unreasonable modification succeeds only if the mandatory second tier is invalid if applied to the former supplemental Cola programs. Unless the second tier is invalid the new supplemental Cola program provides an obvious new advantage for present employees, actual benefits for the theoretical but illusory higher Extraordinary Performance Account benefits. Accordingly, Petitioners' contention that the repeal of the former supplemental Colas is invalid fails unless the addition of a mandatory second tier provision is infirm.

### 3. A Mandatory Second Tier Provision Does Not Unconstitutionally Impair Rights of Contract

█ Petitioners, apprehending the foregoing implication, now contend that a mandatory second tier provision impairs vested contract rights under the former supplemental Cola statutes because of its derivative impact upon benefits under those programs. They argue, without benefit of legal support, that since a mandatory second tier provision would ultimately cause benefits under the former supplemental Colas to fall short of the maximum levels called for "it destroys the vested [former supplemental Cola] benefit." The argument assumes the answer. The appropriate question is whether there is a vested contract right under the former supplemental Cola statutes to continued contributions by new employees which is impaired by a statute that places new employees in a noncontributory pension program.

Unlike most statutes providing for pension benefits, the former supplemental Cola statutes offer benefits which are expressly predicated upon the availability of monies in the fund from which they are to be drawn. (§§ 21235-21236; Stats. 1988, ch. 1356.) There is no right to their payment if the fund is insufficient to fund the benefits. (See *Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 352 [71 Cal.Rptr. 135, 444 P.2d 711].) The question then arises whether the statutory scheme establishing the former supplemental Colas contains an express or implied promise that the Legislature will not change the nature of the pension system as to future employees if that would have a detrimental impact on the fund from which the former supplemental Colas were to be paid. (See *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d at pp. 504-506.)

There is no such promise in the statutory scheme, either express or implied. The express dependence of the former supplemental Cola benefits

upon the prescribed funding scheme belies an assurance that the benefit targets are promises. A promise not to change the character of a pension program as to new employees is a fundamental constraint on the freedom of action of the Legislature. There is no such promise expressed in the statutes and we will not imply one. "Future employees do not have a vested right in any particular pension plan (*Estes* v. *City* of *Richmond* [(1967) 249 Cal.App.2d 538], pp. 544-545 [57 Cal.Rptr. 536].) And, although active and retired members have a vested right to a pension, they do not have a vested right to control the administration of the plan which provides for the payment of pensions." (*Whitmire* v. *City of Eureka* (1972) 29 Cal.App.3d 28, 34 [105 Cal.Rptr. 185].)

This court implied contractual obligations in *Valdes* v. *Cory* and *California Teachers Assn.* v. *Cory* which constrained the administration of PERS and the Teachers' Retirement Fund. We did so on the strength of assurances to be found in the language of the governing statutes. In both cases the statutes showed a "commitment to permanency" of funding of "critical importance" to the "underlying contractual promise to pay the pensions . . . ." (*California Teachers Assn.* v. *Cory, supra*, 155 Cal.App.3d at p. 506.) We noted that the implication of suspension of legislative control must be "unmistakable." (*Id.* at p. 509.) The implication Petitioners urge here falls short of that requirement.

Had the mandatory second tier been enacted independently of the new Cola program its impact upon the funding of the former supplemental Colas would furnish no cause of action. For that reason the mandatory second tier must be taken into account in evaluating the comparative value of the new supplemental Cola. As we have explained, that renders nonmeritorious Petitioners' contention that the new supplemental Cola is not a reasonable modification as to the employees who may have vested contract rights.

The repeal of the former supplemental Cola statutes effected by Chapter 83 is valid.

## II

*The Use of Funds From the Former Supplemental Cola Programs to Offset Employer Contributions Does Not Impair Funding Rights Identified in Valdes v. Cory*

■ Petitioners contend that in any event, the use of the fund made available by the repeal of the former supplemental Cola programs to defray employer contributions to the PERS fund impairs vested contract rights to funding which we identified in *Valdes* v. *Cory, supra*, 139 Cal.App.3d 773.

What we said in *Valdes* v. *Cory*, to which Petitioners point, rests upon "the nature of the reserve against deficiencies." (139 Cal.App.3d at p. 788.) That fund is statutorily allocated to meet contingencies that could impair the actuarial soundness of the PERS fund. In this case, the *valid* repeal of the former supplemental Cola programs has created a unique fund of a critically different nature. These moneys were not previously counted toward the actuarial soundness of PERS, were not reserved to underwrite the actuarial soundness of the basic pension benefits, and are not now tied to the provision of any special benefits required to be paid.[6] Shorn of its relation to the benefits provided under the former supplemental Cola programs, the fund is available to back the actuarial soundness of the PERS system and may be applied to offset the employer contributions that would otherwise be required to that end.

Petitioners rely upon the portion of *Valdes* v. *Cory* which rejects the argument that the state had not defaulted in its continuing obligation to make monthly payments to the PERS fund by merely changing the source of the contributions from the general fund to the PERS reserve against deficiencies. (139 Cal.App.3d at pp. 787-790.) In this passage we considered the argument of the Director of Finance that the state met its continuing obligation to make monthly payments from the PERS reserve against deficiencies. (*Id.* at p. 787.) We rejected the argument on the ground that it "misconceives the nature of the reserve against deficiencies." (*Id.* at p. 788.)

Petitioners submit that the passage forbids the use of any PERS fund of whatever nature to offset an otherwise required employer contribution. To the extent that the language in *Valdes* v. *Cory* is susceptible to this reading it addresses matters not in issue in that case. The preservation of the actuarial soundness of PERS entails a comparison of the funds available to meet its financial obligations with the obligations. If for some lawful reason the existing PERS funds are demonstrably sufficient for actuarial soundness without the state's periodic contribution, the Legislature may forego the contribution without violating the holding in *Valdes* v. *Cory*. (See 139 Cal.App.3d at p. 787.)

Funds may be counted only once to determine the amount of the employer contribution necessary to keep the system in actuarial trim. In keeping with

---

[6]For this reason petitioners' argument that permitting consideration of the former supplemental Cola funds to offset employer contributions will establish a precedent for future expropriation of other PERS funds is ill-founded. Petitioners' alarm is apparently based upon the addition of the following underlined language in an amendment of section 20203.3. "Notwithstanding any other provision of law, no funds in the retirement fund shall be expended for any purpose other than the cost of administration of the system, investments for the benefit of the system, the reduction of employer contributions, and the provision of benefits to the members and retired members of the system and their survivors and beneficiaries." Whatever the purpose of the amendment, it cannot overrule *Valdes* v. *Cory*.

*Valdes* v. *Cory*, funds in a reserve account which are dedicated to backstopping the integrity of the system against unexpected contingencies may not be used to offset the employers' obligations to contribute to the actuarial soundness of the system unless there is a predicate showing that their use will not undermine the financial integrity of the system.

Petitioners claim that *Valdes* v. *Cory* prohibits the offset here because, as in that case, Chapter 83 was enacted "without any *actuarial* input or recommendation from the Board, as directed by former section 20750.9, that contributions could or should be eliminated." The argument is unpersuasive because, unlike *Valdes* v. *Cory*, an appropriate actuarial predicate existed prior to the enactment of Chapter 83.

In *Valdes* v. *Cory* we discerned in the statutes which imposed actuarial duties upon the PERS Board a requirement that periodic employer contributions not be altered "absent actuarial input from the board in a timely manner." (139 Cal.App.3d at p. 787.) The evidence we considered did not show whether the transfer of funds from the reserve against deficiencies would undermine the security of members' rights to receive vested benefits.[7] The failure of the State to meet its burden to demonstrate the absence of such an impact accounts for our rejection of its arguments, both those considered in the opinion and those rejected without discussion.

In this case, the monies which initially funded the former supplemental Colas were obtained from the reserve against deficiencies pursuant to a finding by the PERS Board that the money could be so allocated *without* jeopardizing the actuarial soundness of the system. "In enacting this act, the Legislature agrees with the findings of the chief actuary and the board, who, on June 16, 1982, determined that funds in the reserve for deficiencies may be allocated from the reserve without jeopardizing the actuarial soundness of the system." (Stats. 1982, ch. 330, § 1, pp. 1617-1618.) The subsequent allocations of earnings on employee contributions to the former supplemental Cola funds were accomplished, with the apparent acquiescence of the PERS Board, pursuant to statutes which were not challenged as actuarially unsound when enacted.

---

[7]At the outset of *Valdes* v. *Cory* we ascertained that PERS is intended to be maintained on a sound actuarial basis and that such a transfer of funds impaired the member's contract rights in such a fund. (139 Cal.App.3d at pp. 785-786.) We then said: "[h]aving delivered ourselves of this dictum we confess that the record before us is woefully incomplete and inadequate as a basis upon which to determine whether the disputed provisions of chapter 115 do in fact impair the actuarial soundness of the PERS. [Citations.] [¶] We *therefore* turn to consideration of the contention that the state has a statutorily created contractual obligation, impaired by operation of chapter 115, to make systematic, substantial monthly contributions to the PERS fund in order to fund pension benefits as liability therefor is incurred." (*Id.* at p. 786, italics added.) The subsequent analysis rests upon this state of the record.

The Legislature was entitled to view this allocation of monies to fund the former supplemental Colas as not undermining the security of members' rights to receive their basic pension benefits. Unlike the reserve against deficiencies the former supplemental Cola funds were not allocated to backstop the basic pension benefit promises. Since the funds were not counted toward the maintenance of the actuarial soundness of the PERS fund or allocated to cover contingencies that could impair actuarial soundness they are logically immaterial to actuarial soundness. Their use to offset employer contributions that would otherwise be required to be made is not prohibited by the holding in *Valdes* v. *Cory*.

III

*The Use of Former Supplemental Cola Funds to Reduce Employer Contributions Otherwise Required Does Not Unconstitutionally Invade the PERS Trust*

■ Petitioners contend that the use of the former supplemental Cola funds to reduce employer contributions violates California Constitution, article XVI, section 17.[8] The thrust of the argument is that since the assets of the system are declared in that section to be "trust funds" which "shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system" they cannot be used to defray the employers' funding obligation. The answer to this argument is that the money has not been diverted from the system and is to be used for the purposes authorized by the California Constitution.[9]

[8]California Constitution, article XVI, section 17, in pertinent part is as follows:

". . . . . . . . . . . . . . . . . . . . . . . .

"Notwithstanding provisions to the contrary in this section and Section 6 of Article XVI, the Legislature may authorize the investment of moneys of any public pension or retirement system, subject to all of the following:

"(a) The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.

"(b) The fiduciary of the public pension or retirement system shall discharge his or her duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system."

[9]We note parenthetically that the parties argue over the application of subdivision (b) of article XVI, section 17, the topic of a recent opinion of this court in *City of Sacramento* v. *Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1492-1494 [280 Cal.Rptr. 847]. The argument is a digression since the subdivision pertains to the duties of the fiduciary of the public pension or retirement system. This refers to the duties of the trustees and not, save perhaps derivatively when legislating upon that topic, to the duties of the Legislature which are in issue here.

The language of California Constitution article XVI, section 17, upon which Petitioners rely, was enacted by an amendment of June 5, 1984. The ballot arguments of the proponents of the measure asserted that the measure would "give public pension assets full constitutional protection as trust funds" and "guarantee[] that neither the Governor nor future Legislatures will ever be able to use this money for other purposes." (Ballot Pamp., argument in favor of Prop. 21 as presented to the voters, Prim. Elec. (June 5, 1984) p. 26.) The arguments also assert that under the measure "the *only purpose* for which these trust assets can be used is the delivery of retirement benefits" and that it "[e]nacts the *sole and exclusive purpose rule* which imposes on fund trustees the legal obligation to perform their duties *solely* in the interest of plan beneficiaries." (*Ibid.*, original italics.)

Neither the trust provisions of California Constitution article XVI, section 17, nor the statements of its proponents in the ballot argument apply to the action challenged here. The use of the former supplemental Cola funds to reduce the employer contributions otherwise necessary to keep the PERS fund in actuarial trim does not invade the PERS trust. (Cf., e.g., Stats. 1982, ch. 330, § 1, pp. 1617-1618 quoted *ante*, at pp. 655-656.) The funds, in the words of the California Constitution, continue to be "held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system." The funds, in the words of the ballot argument, will only be used for "the delivery of retirement benefits." They remain PERS assets until they are paid to PERS members or beneficiaries or to defray the costs of administration of the system.

The use of these funds to meet the employers' continuing funding obligation is no more proscribed by California Constitution article XVI, section 17, than is the use of earnings attributable to the employer accounts of the PERS fund for the same purpose. The contract right to periodic employer funding can only be determined by considering the value of the PERS assets that are available to defray its legal obligations. If this use were barred by the exclusive purpose language of subdivision (a) of article XVI, section 17, the funding obligation would be rendered unintelligible.

For these reasons the contention that the use of the former supplemental Cola funds to reduce employer contributions violates California Constitution, article XVI, section 17, is not meritorious.

## IV

*The Assignment of PERS Actuarial Duties to an Outside Actuary Is Not Unconstitutional*

*A. Appointment of the Actuary by the Governor Does Not Present an Intolerable Conflict of Interest*

 Petitioners challenge other provisions of Chapter 83, which transfer actuarial duties from the PERS Board to an actuary appointed by the Governor, as violating article XVI, section 17 of the California Constitution. As related, it provides that the PERS assets "are trust funds" and the "fiduciary of the . . . system shall discharge his or her duties . . . solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system." Petitioners suggest that these provisions constitutionalize the law of trusts and under that law the Actuary cannot qualify as a fiduciary because Chapter 83 places the Actuary under the control of the Governor and subject thereby to an intolerable conflict of interest precluding a fiduciary relationship with beneficiaries of the PERS trust fund.

 Since Petitioners tender a facial challenge to the constitutionality of Chapter 83 we must test the legislation by the fair reach of its terms, avoiding a resolution predicated upon uncertain or contingent future events. "To support a determination of facial unconstitutionality, voiding the [challenged provisions of the] statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215], original italics.) Nonetheless, the amendment of California Constitution article XVI, section 17, in 1984 requires close judicial scrutiny of changes to the status quo which threaten the trust protection of public employee retirement funds. "[A] major change [wrought by the amendment] was to specify that the trust funds held by a public pension or retirement system are to be administered in a manner to best provide benefits to the participants of the plan. (See, Historical Notes to Cal. Const., art. XVI, § 17, 3 West's Ann. Cal. Const (1991 pocket supp.) pp. 150-157.) This latter change gave constitutional significance to the preexisting statutory mandate that the 'Public Employees' Retirement Fund is a trust fund created and administered . . . , solely for the benefit of the members and retired members of the system and their survivors and beneficiaries.'

(§ 20200.)" (*City of Sacramento* v. *Public Employees Retirement System*, *supra*, 229 Cal.App.3d at p. 1493.)

Section 20006, as enacted by Chapter 83, provides that the Actuary "shall be deemed to succeed to and assume the fiduciary obligations pertaining to actuarial determinations previously held by members of the board, including, but not limited to, those set forth in Section 17 of Article XVI of the California Constitution." We must assume, consistent with our limited scope of review, that the Actuary in carrying out the assigned duties will comply with this mandate.

Section 20006.1 provides that the Actuary shall "make an actuarial investigation into the mortality, service, and compensation experience of members and persons receiving benefits," make an "actuarial valuation of the assets and liabilities of this system," and "determine the rate of interest being earned on the Retirement Fund . . . ."[10] Under the prior law these functions were carried out by the PERS Board based upon calculations and advice of actuaries "regularly employed . . . by the [PERS] board or the chief actuary's designee." (Stat. 1979, ch. 1110, § 3, p. 4018, eff. Sept. 28, 1979.)

We will assume that California Constitution article XVI, section 17, imports the existing law of trusts and that the Actuary must satisfy its requirements for fitness to serve as a trustee. A trustee may be removed by a court for misconduct, unfitness, or acquisition of an adverse interest. (See, e.g., Prob. Code, § 15642; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 55.) Petitioners cite numerous cases in which trustees subject to a conflict of interest have been sanctioned. These cases involve a conflict which resulted in an identified breach of trust. The claim in this case is tendered in the absence of an actual breach of trust. The cases relied upon are therefore inapposite.

There is no precedent in the law of trusts for the circumstance in which a Legislature has created the office of actuary and it is claimed that the manner of appointment to the office constitutes a categorical conflict of interest. Ordinarily the Legislature is free to prescribe the law of trusts. Viewing the Legislature in this circumstance as analogous to the settlor of the PERS trust, there is no breach of the trust law. ■ Where a trustee is named by the

---

[10]Section 20006.1 provides: "On an annual basis, no later than December 1 of each year, the actuary shall make an actuarial valuation of the liabilities for benefits under this part on account of employees of the state. As of the effective date of this section, and thereafter at the end of periods not to exceed four years, the actuary shall make an actuarial investigation into the mortality, service, and compensation experience of members and persons receiving benefits and an actuarial valuation of the assets and liabilities of this system. From time to time, the actuary shall determine the rate of interest being earned on the Retirement Fund after deducting from earnings amounts applied to costs of administration of the system."

settlor who is aware of the possible conflicts of interest inherent in the appointment, removal on the ground of conflict of interest is ordinarily unwarranted without an actual breach of trust. (See, e.g., *Estate of Gilliland* (1977) 73 Cal.App.3d 515, 528 [140 Cal.Rptr. 795]; Rest.2d Trusts, § 107, com. f.[11] ) The bare potential for a conflict of interest does not categorically bar a fiduciary from functioning as a trustee.

The most forceful of Petitioners' claims of conflict of interest is that under section 20006 (*ante,* at p. 658) the Actuary's contract is subject to termination at the will of the Governor. That is the reading initially adopted by the Governor. His original contract proposal provided for termination of the Actuary's contract on 30 days notice. Section 20006 provides that the contract of appointment "shall be for a fixed period of time not to exceed three years as determined by the Governor." We asked the parties whether termination at will is consistent with this provision. The Governor responded that section 20006 precludes him from terminating the Actuary's contract without just cause during the "fixed" period of the contract and that the contract executed with the Actuary will so provide.

This is our construction of section 20006. The term "fixed period" implies that the contract is not subject to termination at will. (Compare Lab. Code, §§ 2924, 2922.) Section 20006 contains several provisions which minimize the possibility that the Governor might attempt to influence the performance of the Actuary's duties through the power of selection. The Actuary must be an enrolled actuary,[12] the compensation must be fixed by the contract, the Actuary may not be awarded a "successive" contract[13] and must assume the fiduciary obligations formerly assigned to the PERS Board, and the Legislature must approve the choice of the Actuary. (§ 20006.) These provisions underscore the view that the "fixed period" serves a similar purpose. This reading is favored because it minimizes the prospect of an unconstitutional conflict with article XVI, section 17 of the California Constitution. (See *Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150].)

---

[11]We note the following caveat in Restatement Second of Trusts section 107, comment f: "In such a case [where the trustee seems subject to a conflict], however, the conduct of the trustee in the administration of the trust will be subject to careful scrutiny; and if it appears to the court that because of his interest or otherwise he is unduly favoring himself and not fairly exercising the discretion conferred upon him, the court will remove him as trustee."

[12]An "enrolled actuary" means an actuary enrolled under subtitle C of title III of the federal Employee Retirement Income Security Act of 1974. (See § 7507.)

[13]The term "successive" does not preclude subsequent appointments of the same actuary. Whether this is subject to redress for abuse by manipulation of the frequency and terms of the contracts is an issue we do not reach as it may never arise. As we note in the text, an abuse of the process of selection which impairs the fiduciary obligations of the Actuary is subject to judicial scrutiny.

The pertinent question is whether the selection of the Actuary by the Governor under these conditions places the Actuary in a position hopelessly in conflict with the fiduciary obligations imposed by California Constitution article XVI, section 17. We think not. The safeguards enacted in section 20006 sufficiently insulate the Actuary from control by the Governor so as to permit the Actuary to function as a fiduciary. Those duties are constitutionally prescribed by article XVI, section 17. This implicitly subsumes the principle of trust law that the Actuary's primary duty is to the beneficiaries of the trust. (See *City of Sacramento* v. *Public Employees Retirement System, supra*, 229 Cal.App.3d at p. 1494.)

### B. The Law of Trusts Does Not Require That Actuarial and Other Functions Be Performed by the Same Trustees

Petitioners claim that the transfer of actuarial functions is inconsistent with the law of trusts because the PERS Board trustees cannot administer PERS without the power to control the Actuary. We asked the parties whether a division of trustee functions would be permissible under the law of trusts if we viewed the Actuary and the PERS Board as cotrustees or the Actuary as a special trustee. Petitioners suggest that these doctrines cannot be applied because cotrustees must supervise each other. The Governor replies that nothing in the law of trusts precludes the division of functions resulting from Chapter 83 among cotrustees or special trustees. The Governor has the more persuasive argument.

Petitioners suggest that under California law cotrustees must act unanimously, citing Probate Code section 15620. However, that statute belies the assertion since it merely prescribes unanimity unless otherwise provided in the trust instrument. As the Governor notes, Restatement Second of Trusts section 194, comment d, indicates a general rule that powers can be divided among trustees if it is so provided by the terms of the trust. The comments to section 185 of the Restatement show that discretionary powers may be assigned to nontrustees, who may also be subject to fiduciary obligations.

Petitioners suggest that the division of powers is inconsistent with the law of trusts because it imposes on each trustee the duty to participate in the administration of the trust and to take reasonable steps to prevent or cure a breach of trust by fellow trustees. (See Prob. Code, § 16013.) It is not a necessary consequence of these obligations that all trustees be given an equal share of the duties or powers accorded by the trust instrument. If that were the case there would be no doctrine of special trustees or holders of special powers.

While there may be legitimate concerns regarding a potential conflict of interest, we cannot assume that the Actuary will not faithfully adhere to the

fiduciary obligations imposed upon it. Given their facial challenge, Petitioners "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise" from the application of Chapter 83. (*Pacific Legal Foundation* v. *Brown, supra*, 29 Cal.3d at p. 180.) Petitioners point to no case law nor doctrine in the law of trusts which can reasonably be applied under the aegis of California Constitution article XVI, section 17, to categorically bar the Actuary from acting as a fiduciary under a section 20006 contract. If the Actuary violates those obligations, Petitioners may seek judicial relief in the manner of all other beneficiaries of a trust.

### C. The Transfer of Actuarial Functions Is Not Invalid on Grounds of Improper Urgency Statute, Impairment of Contract, Denial of Due Process, or Improper Delegation

That leaves several less developed claims of invalidity of the transfer of actuarial functions. Petitioners contend that the transfer of functions is founded on a pretextual declaration of urgency, improperly impairs a vested contract right to have the PERS Board perform those functions, denies due process of law, and improperly delegates legislative authority without appropriate safeguards or standards. These claims warrant no extended discussion.

Petitioners suggest that the transfer of function provisions contravenes California Constitution, article IV, section 8, subdivision (d), which defines the term "urgency statute." The argument is elliptical and undeveloped except for the claim that the "fiscal emergency" proffered by the Legislature as the ground of urgency are pretextual. Petitioners cite *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] in support of the suggestion that this court may freely "look past the bald assertion" of "fiscal emergency." However, that case is inapposite. It addresses the topic of review of a justification for a contract impairment and not the standard applicable to review of a declaration tendered to justify an urgency statute. As the Governor suggests, the latter scope of review is exceedingly limited (e.g., *Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 422-423 [84 P.2d 1034]) and Petitioners make no showing invoking such review.

Petitioners suggest that the transfer impairs contract rights of PERS members and of the City of Sacramento, which made a contract with PERS calling for employer contributions "subject to adjustment by [the PERS] Board." These claims are groundless for the reasons given in response to the contention that the mandatory second tier provision impairs a vested contract right. (Discussed in pt. I(b)(3), *ante.*) There is no ground for implying a statutory promise that the duty of performing these functions would not be

transferred to another entity. There is a similar shortcoming in the argument regarding the City of Sacramento. Assuming for the sake of discussion that Petitioners are proper parties to raise purported rights under that contract, the claim is even weaker, since the state has no obligation of payment under that contract. (See, *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d at p. 511.)

That brings us to the claim that the transfer of functions violates both substantive and procedural due process of law. As to substantive due process (see 7 Witkin, Summary Cal. Law (1988) Constitutional Law, § 481, p. 669) Petitioners claim that the transfer is arbitrary. Their legal argument is perfunctory, consisting of a bare citation of a police power case. The citation is inapposite. ▆▆▆ The wisdom of the legislation is not within our purview. (See *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 369 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].) ▆▆▆ The determination of which of two lawful ways of performing the transferred actuarial functions is preferable is a policy judgment for the Legislature. Petitioners offer no persuasive backing for their claim that the alternative selected by the Legislature is irrational.

Petitioners also claim that the transfer scheme violates procedural due process because it does not afford PERS members notice and a hearing on the determinations assigned to the Actuary. They suggest they have a property right to an actuarially sound PERS fund which may be violated by mistakes the Actuary makes in setting employer contribution rates too low and which warrants procedural due process protection. We will assume for the sake of discussion that Petitioners are correct. The claim nonetheless fails on two threshold grounds.

Petitioners make no examination of what process is due. For example, they do not examine the adequacy of the process afforded by judicial review. We are not inclined to develop their gossamer argument on this point in light of their burden to establish the claim of unconstitutionality.

The second shortcoming is that Petitioners fail to show an entitlement to the remedy they seek. They seek to invalidate the transfer of functions on this ground in order to revive the former statutory scheme. (Voiding every statutory mechanism to set employer contributions is no help; that would work the same deprivation of the claimed property right.) However, the former scheme can as easily be faulted along the same lines.

Petitioners suggest that the former scheme provided superior notice and an opportunity to be heard because under it they were afforded the "opportunity

to review" proposed actuarial determinations in a hearing before the PERS Board. They fail to cite authority for this claim. If the opportunity is a matter of practice, the same practice could be adopted by the Actuary. The deficiency in process, if any, is not attributable to a difference in the statutory schemes. (Cf. 7 Witkin, Summary Cal. Law, *supra*, Constitutional Law, § 519.) Petitioners' remedy, if any, is to seek the creation of an appropriate administrative process by implication from the present statutory scheme. (See generally, *Southern Pacific Transportation Co.* v. *State Board of Equalization* (1987) 191 Cal.App.3d 938, 950 [237 Cal.Rptr. 191].) They seek no such remedy in these proceedings, and in view of the undeveloped nature of their arguments, we imply no view of the matter beyond the conclusion that their claim of invalidity is not meritorious.

That leaves their claim that the delegation of powers to the Actuary is improper. Petitioners do not explain how the transfer of functions provides less of a standard for the exercise of the actuarial functions than the antecedent scheme. In light of Petitioners' sketchy argument it suffices to say that the standards for the conduct of the Actuary appear sufficiently set out in Chapter 83 when coupled with the implication that the field of actuarial practice is subject to professional norms known to its practitioners and enforceable, if need be, by the judiciary.

### DISPOSITION

None of the claims of invalidity of Chapter 83 tendered by the Petitioners has merit. The alternative writ is discharged and the petition is denied.

Puglia, P. J., and Davis, J., concurred.

Petitions for a rehearing were denied April 13, 1992, and the petitions of both petitioners and respondents for review by the Supreme Court were denied June 18, 1992. Mosk, J., and Kennard, J., were of the opinion that the petitions should be granted.