Filed 3/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PROTECT OUR BENEFITS, <br><br> Petitioner and Appellant, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent. | A140095 <br><br> (San Francisco County <br> Super. Ct. No. CPF13512788) |

Since 1996, retired employees of the City and County of San Francisco (the City) have been eligible to receive a supplemental cost of living allowance (supplemental COLA) as part of their pension benefits when the retirement fund's earnings from the previous year exceeded projected earnings. On November 8, 2011, City voters passed Proposition C, an initiative measure that, among other things, amended the Charter of the City and County of San Francisco to condition the payment of the supplemental COLA on the retirement fund being "fully funded" based on the market value of the assets for the previous year.

Protect Our Benefits (POB), a political action committee representing the interests of retired City employees, appeals from a superior court order denying its petition for writ of mandate seeking to invalidate this amendment as an impairment of a vested contractual pension right under the contract clauses of the federal and state Constitutions.[1] With respect to current City employees and employees who retired after

---

[1] Under the federal Constitution, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." (U.S. Const., art. I, § 10, cl. 1.) Under the state constitution, "A . . . law impairing the obligation of contracts may not be passed." (Cal. Const., art. I, § 9.)

the supplemental COLA first went into effect on November 6, 1996, we agree the full funding requirement cannot stand. With respect to employees who retired prior to November 6, 1996, we conclude they had no vested contractual right in the supplemental COLA and that consequently, the 2011 amendment may be applied to their pensions. We reject POB's claim that the full funding requirement must be set aside for the additional reason that the Board of Supervisors for the City and County of San Francisco (Board of Supervisors) failed to obtain an adequate actuarial report before placing Proposition C on the November 8, 2011, ballot.[2]

## I. FACTUAL AND PROCEDURAL HISTORY

### A. San Francisco's Public Pension Plan

The City operates its own retirement system, which is known as the San Francisco Employees' Retirement System (SFERS) and is overseen by the City's Retirement Board. SFERS administers a pension plan that pays defined benefits to retired City employees based on their years of service, age of retirement and the highest amount of their compensation for a specified period. (See *Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1223-1224.) The funding for pension benefits comes from three sources: contributions from current City employees, contributions from the City, and investment earnings on assets SFERS holds in trust for retirees (the Fund).

As part of its administration of the Fund, the Retirement Board retains an independent actuary to produce an actuarial valuation of the Fund each year. The actuarial valuation method used for the Fund includes a "five-year smoothing" technique in which gains or losses in asset values are spread out over a five-year period, thus dampening the volatility of the valuation of the Fund's assets. The actuary also calculates the "funding ratio," that is, the ratio of the Fund's assets to its actuarial

---

[2] In addition to the briefs filed by the parties, we have read and considered the arguments presented by the Retired Firemen and Widows Association of the San Francisco Fire Department in an amicus curiae brief filed on behalf of POB.

2

liabilities.[3]  When the Fund's assets exceed its actuarial liabilities, it is said to be "fully funded."  The valuation of the Fund and its funding ratio can also be calculated on a "market" basis, which measures the fair market value of the Fund's assets if the entire portfolio were to be liquidated as of a certain date, and compares that valuation to the Fund's actuarial liabilities.  In any given year, the actuarial valuation of the Fund might exceed the market valuation, or vice versa.

According to a 2012 actuarial valuation report, the Fund was fully funded, on both an actuarial and a market basis, during each fiscal year from 1994–1995 through 2007–2008.  The Fund was not fully funded during fiscal years 2008–2009 through 2011–2012, the years coinciding with the national financial crisis that began in 2008.

B.  Basic COLA

Retired City employees have long been eligible to receive an annual cost of living adjustment to their pension payments based on changes in the Consumer Price Index (the basic COLA), generally of up to two percent.  (S.F. Charter, § A8.526.)

C.  1996—Supplemental COLA

In the election held on November 5, 1996, City voters adopted Proposition C, an initiative measure amending the City's Charter (Charter) to establish a supplemental COLA for City retirees in addition to the basic COLA.  Proposition C added Charter section A8.526-1, which required "all earnings of the Retirement Fund in the previous

---

[3]  "[T]he cost of the retirement promise is an 'actuarial liability.'  Determining the amount of the actuarial liability for a retirement system requires the actuary to propose assumptions about the size and future growth of the workforce and payroll, how salaries will grow over time, how long employees and surviving spouses/registered domestic partners will live, how long employees will work, how many employees will become disabled, how many employees will marry or enter into registered domestic partnerships, etc.  These are often called demographic assumptions.  An actuary makes assumptions about these various demographic factors and then periodically, perhaps every three to five years, compares the actual experience under the plan to the various demographic assumptions, and recommends changes to the assumptions to make them closer to actual experience."  (Cal. Public Sector Employment Law (Matthew Bender 2014) Pensions and Retirement, § 9.08[2], pp. 9-30 to 9-31.)

3

fiscal year which are in excess of the expected earnings on the actuarial value of the assets" to be placed in a reserve account and used to pay a supplemental COLA of up to three percent of current benefits, inclusive of the basic COLA. (Charter, § A8.526-1(a), added Nov. 5, 1996.) "Expected earnings" were defined as "the earnings projected by the actuarial assumption for return on assets that was in place for that fiscal year." (*Ibid*.)

Charter section A8.526-1 did not initially provide that the supplemental COLA would be added to a retiree's pension on a permanent basis. Rather, in years when the funds in the reserve account were insufficient to pay the supplemental COLA, pensions would "revert to the level they would have been if supplemental cost of living adjustments had never been made." (Charter, § A8.526-1(b), added Nov. 5, 1996.) The amount of money placed in the reserve account would not exceed the amount necessary for the immediate fiscal year and the following two years, and, as the ballot digest explained: "The Reserve Account would not be used to offset years of below-estimate investment income, or to reduce the City's contributions to the retirement system. However, when the Reserve Account had enough money to fund three years of COLA increases, any additional money would be used to offset below-estimate years and to reduce the City's contributions to the retirement system." (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 97.)

D. 2002—Supplemental COLA Made Permanent

On March 5, 2002, City voters passed Proposition B, an initiative making the supplemental COLA permanent, in the sense that once it had been added to an employee's pension payment, it could not be reduced. Proposition B amended Charter section A8.526-1 as follows: "(c) On and after June 30, 2003, any supplemental cost of living benefit adjustment, once paid to a member, shall not be reduced thereafter. [¶] (d) On and after June 30, 2003, the Reserve Account set forth in this section shall be used to finance only the increase in the supplemental cost of living benefit adjustments for the next ensuing fiscal year as set forth in section (a). If there are insufficient funds in the Reserve Account to pay the increase in the supplemental cost of living benefit

4

adjustments for the next ensuing fiscal year, then the increase in the supplemental cost of living benefit adjustments for that fiscal year shall not be paid.  However, any excess earnings as defined in this section shall be accumulated until an amount sufficient to make one fiscal year's increase in the supplemental cost of living benefit adjustments is reached." (Charter, § A8.526-1(c) & (d), as amended Mar. 5, 2002.)

E. 2008—Supplemental COLA Increased

On June 3, 2008, City voters passed Proposition B, which changed the qualifications for retiree health and pension benefits, established a retiree health care trust fund, and raised the maximum annual amount of the supplemental COLA from 3 percent to 3.5 percent, less the amount of any basic COLA.  The supplemental COLA provisions were placed in newly enacted Charter section A8.526-3, which stated that if the excess earnings in a particular year are insufficient to pay a 3.5 percent supplemental COLA, "then to the extent of excess earning, said allowances shall be increased in increments of one-half percent (.5%) up to the maximum three and one-half percent (3.5%) of the allowance as of June 30, less the amount of any cost of living adjustment . . . ." (Charter, § A8.526-3(b)(2), added June 3, 2008.)  When the previous year's earnings exceeded the expected earnings but were not sufficient to fund any supplemental COLA, "the retirement board shall reserve the excess earnings for that year.  Said reserved earnings shall accumulate only until such time that said reserved earnings, plus the next year's earnings in excess of the expected earnings on the actuarial value of the assets, are sufficient to fund one fiscal year's increase in the supplemental cost of living benefit adjustment, at which time the earnings in reserve shall be withdrawn and used to fund a supplemental cost of living benefit adjustment . . . ." (*Id*., subd. (c).)  As under prior law, "[a]ny supplemental cost of living benefit adjustment, once paid to a member, shall not be reduced thereafter." (*Id*., subd. (d).)

F. Financial Crisis and Effect on the Fund

In fiscal year 2008–2009, the Fund lost about 25 percent of its value due to the financial crisis and economic downturn of that period.  Consequently, the Fund was no

5

longer fully funded, meaning it no longer contained assets sufficient to pay its actuarial liabilities. Measured by the actuarial value of its assets, the Fund fell from 104 percent funded as of July 1, 2008, to only 97 percent funded as of July 1, 2009. Measured by the market value of its assets, the Fund went from 103 percent funded as of July 1, 2008, to 72 percent funded as of July 1, 2009.

### G. November 8, 2011, Election—Proposition C

In the general election held November 8, 2011, City voters adopted Proposition C, an initiative measure making numerous changes to the financing and scope of SFERS pension benefits and retiree health care. The "Findings and Purpose" section of the ballot explained: "Between June 2007 and January 2009, the Dow Jones Industrial Average declined 40%. This historic decline and the subsequent great recession have harmed the City's budget in two ways. First, it caused the City's tax and fee revenues to be significantly lower than expected, worsening the City's deficit. Second, it caused the retirement fund to drop from being fully funded (based on the actuarial value of the assets)—or more than fully funded—to being only partially funded. As a result, to make up the shortfall in the retirement fund, the City has had to increase substantially its employer contributions, further exacerbating the City's deficit." (S.F. Voter Information Pamp. (Nov. 8, 2011) p. 111.)

Although the changes effected by Proposition C were extensive, only one is germane to this case—the amendment of Charter section A8.526-3(d) (hereafter section A8.526-3(d)) to provide: "To clarify the intent of the voters when originally enacting this Section in 2008, beginning on July 1, 2012 and July 1 of each succeeding year, no supplemental cost of living benefit adjustment shall be payable unless the Retirement System was also fully funded based on the market value of its assets for the previous year." (Charter, § A8.526-3(d), as amended Nov. 8, 2011.) The amendment did not change the requirement that excess earnings be reserved when insufficient to fund a supplemental COLA and accumulated until they were sufficient to fund a supplemental COLA payment. (*Id.*, subd. (c).)

H.  Petition for Writ of Mandate

POB filed a petition for writ of mandate (Code Civ. Proc., § 1085) challenging the constitutionality of section A8.526-3(d).  The petition alleged the new full funding requirement impairs vested contractual pension rights under the federal and state Constitutions because notwithstanding language in the provision characterizing it as a clarification of existing law, it was a change that diminished the supplemental COLA benefit.

The trial court denied the writ petition and entered judgment in favor of the City.  In its statement of decision, the court construed section A8.526-3(d) as doing no more than subjecting retirees to " 'those gains reasonably to be expected from the [pension] contract.' "  It reasoned section A8.526-3(d) "returns supplemental COLAS to the purpose for which the voters originally added them to the City Charter:  to allow retirees to share in surplus earnings of the Retirement Fund when the Fund can afford to do so.  As the relevant pages from the City's voter pamphlets show, the voters enacted supplemental COLAs in 1996, and expanded them in 2002 and 2008, after being assured, in the relevant ballot pamphlet materials, that the Retirement Fund was fully funded, and that the City was benefiting from the Fund's investment earnings by making little or no employer contributions to the Fund.  Under such circumstances, the voters were told, it would be unfair not to allow retirees to also share the bounty; the voters were urged that if the economically flush times redounded to the benefit of the City and its current employees, then retirees, too, should share that benefit.  [Citation.]  The legislative history of the relevant Charter amendments from 1996 onward shows that the availability of supplemental COLAs was tied to whether the Fund was fully funded.  . . .  Indeed, were the Retirement Fund not fully funded in 1996, 2002 or 2008, it seems quite unlikely that the voters would have approved or extended supplemental COLAs, as they did."  The court recognized section A8.526-3(d) " 'technically alter[s] an obligation of a contract,' " but concluded it was "consistent with the spirit or basic theory for which the voters added and extended supplemental COLA benefits to the Charter from 1996 to 2008."  It additionally found that even if section A8.526-3(d) impaired the contractual rights of

7

current employees and those who retired after the supplemental COLA first went into effect in 1996, it did not do so with respect to employees who had by that time already retired " 'because they did not exchange their labors for the benefits created after retirement and for that reason gained no vested contractual rights to them.' [Citations]."

POB appeals from the judgment. (Code Civ. Proc., § 904.1, subd. (a).)

## II. DISCUSSION

POB argues section A8.526-3(d) impairs the vested contractual rights of City workers and pensioners because the full funding requirement reduces the supplemental COLA pension benefits. The City responds the trial court's ruling was correct, and that even if employees who retired after the supplemental COLA first went into effect in 1996 had a vested right impaired by the full funding requirement, employees who retired before the supplemental COLA was first implemented cannot claim such a right. We conclude the 2011 amendment may be constitutionally applied to employees who retired before the effective date of the 1996 initiative establishing the supplemental COLA, but not to current employees or those who retired after the effective date of the 1996 initiative.[4]

### A. Standard of Review

In an appeal from a trial court's decision on a petition for writ of mandate, we review the record to determine whether the trial court's findings are supported by substantial evidence, but decide questions of law independently. (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129.) "Where, as here, the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo." (*Ibid.*)

---

[4] Later in our discussion we separately address the situation of employees who retired before the effective date of the 1996 initiative that first enacted the supplemental COLA (see *post*, at pt. II.H.). Our analysis of vested rights until that point applies only to current employees and those who retired after the effective date of that initiative.

B.  Vested Pension Rights—General Principles

"A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 (*Betts*).)  "Unlike other terms of public employment, which are wholly a matter of statute, pension rights are obligations protected by the contract clause of the federal and state Constitutions.  (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9).  [Citations.]"  (*United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1102 (*United Firefighters*).)  Upon accepting public employment, one acquires a vested right to a pension based on the system then in effect, and to additional pension benefits conferred during his or her subsequent employment.  (*Id*. at p. 1102 & fn. 3.)

While the constitutional proscription against the destruction of vested contractual pension rights "does not absolutely prohibit their modification" (*Allen v. Board of Administration* (1983) 34 Cal.3d 114, 120 (*Allen*)), a lawmaker's power to modify pension rights once vested is " 'quite limited.' "  (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 447 (*Retirement Cases*).)  "With respect to active employees, . . . any modification of vested pension rights must be reasonable, must bear a material relation to the theory and successful operation of a pension system, *and, when resulting in a disadvantage to employees, must be accompanied by comparable new advantages*. [Citations.]  As to retired employees, the scope of continuing governmental power may be even more restricted, the retiree being entitled to the fulfillment without detrimental modification of the contract which he already has performed.  [Citation.]"  (*Allen*, 34 Cal.3d at p. 120, italics added; see *Betts*, *supra*, 21 Cal.3d 859 [former state Treasurer entitled to have pension calculated on the basis of the current state Treasurer's salary, the measurement in effect when former Treasurer was in office, rather than less generous, later-enacted method of calculating pension based on highest salary; no comparable benefits were provided to offset the detriment]; *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 [disapproving amendments to pension plan that increased percentage of employee contributions, changed the method of computation that had previously tied

9

pension benefits to salaries of current employees, and required employees returning from military service to reimburse employee contributions they otherwise would have paid]); *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438 [amendment substituting fixed pension for payments on a fluctuating basis was unreasonable and invalid; increase in benefits for a narrow class of pensioners was not commensurate with detriment imposed].)[5]

### C. COLAs As Vested Pension Rights

The reduction of a cost of living allowance, without a comparable new advantage, has been held to impair the pension contract. In *United Firefighters*, for example, the voters had approved cost of living adjustments for retired city employees in 1966. (*Id*., 210 Cal.App.3d at p. 1101.) The adjustments were tied to the Consumer Price Index and were initially capped at two percent, but a 1971 amendment eliminated the cap and allowed the adjustments to fully reflect the amount of inflation each year. (*Ibid*.) In 1982, the voters passed a charter amendment imposing a three percent cap on the cost of living adjustment. (*Ibid*.) The court concluded the 1982 amendment capping the annual adjustment impaired a vested contractual right to an uncapped adjustment because it "burden[ed] [employees] with a disadvantage" while offering no comparable advantage such as reducing the amount of their pension contributions. (*Id*. at pp. 1102-1104.) The court rejected the city's argument the three percent cap was permissible as to employees hired before the "uncapping" of the cost of living adjustment in 1971, which was

[5] Additionally, when the state exercises its police power, an enactment impairing vested contractual rights may be warranted when (1) the enactment serves to protect basic interests of society; (2) there is an emergency justification for the enactment; (3) the enactment is appropriate for the emergency; and (4) the enactment is designed as a temporary measure, during which time the vested contractual rights are not lost but are merely deferred for a brief period, interest running during the temporary deferment. (*Home Bldg. & L. Assn. v. Blaisdell* (1934) 290 U.S. 398; *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 306 [invalidating statute passed in response to Proposition 13, which precluded state from distributing surplus funds to agencies that had paid a cost of living increase in excess of that paid to state employees].) City makes no attempt to argue section A8.526-3(d) is an exercise of the state's police power or that these factors pertain to the case before us.

designed to protect the pensioners' purchasing power:  "[O]nce the cost of living adjustment was uncapped in 1971, plaintiffs did have a reasonable expectation that pension benefits earned thereafter would be fully adjusted for inflation and their post-retirement standards of living thus would be protected from any *further* diminution."  (*Id.* at p. 1108.)

Similarly, in *Pasadena Police Officers Association v. City of Pasadena* (1983) 147 Cal.App.3d 695, 699 (*Pasadena Police*), the city charter was amended in 1969 to provide for a cost of living adjustment in addition to the basic pension, at a rate equal to the annual percentage change in the Consumer Price Index.  In 1981, after years of inflation resulting in a dramatic increase in the cost of living adjustments, the city charter was amended to cap the annual cost of living adjustment at two percent for certain members. (*Id.* at p. 700.)  The court found the cap impaired a vested right.  (*Id.* at pp. 701-708.)

D.  Section A8.526-3(d) Impairs a Vested Pension Right to the Supplemental COLA

The reasoning of *United Firefighters* and *Pasadena Police* applies to section A8.526-3(d).  Before the enactment of section A8.526-3(d), SFERS retirees were entitled to receive a supplemental COLA benefit when the Fund's actual earnings exceeded expected earnings, without regard to the Fund's market value or actuarial liabilities. Section A8.526-3(d) conditions the payment of the supplemental COLA on the Fund being fully funded based on the market value of its assets.  Because there might be some years in which the Fund will earn more than projected, but will not be fully funded under a market value measurement, the full funding requirement results in a detriment to pensioners who would otherwise be entitled to receive the supplemental COLA.  This diminution in the supplemental COLA cannot be sustained as reasonable because no comparable advantage was offered to pensioners or employees in return.  (*Betts*, *supra*, 21 Cal.3d at p. 864.)

11

E. *Allen* Does Not Support City's Arguments

Citing *Allen*, *supra*, 34 Cal.3d at page 124, the City argues the full funding requirement imposed by section A8.526-3(d) is permissible under the " 'well-established constitutional principle that "laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract." ' " The decision in *Allen* is distinguishable and does not support the conclusion the full funding requirement under section A8.526-3(d) was "reasonably to be expected" by City employees and pensioners.

At issue in *Allen* was the formula for computing the pensions of former state legislators, which had for many years been set at five percent of the current salary for sitting legislators multiplied by the pensioner's years of service. (*Allen*, *supra*, 34 Cal.3d at pp. 117-119.) Though this formula in theory allowed for increases in pension benefits enabling retirees to "maintain a fairly constant standard of living despite fluctuations in living costs," the compensation for sitting legislators remained stagnant at $500 a month between 1954 and 1963, for what was then a part-time job. (*Id*. at pp. 117-118.)

In 1963, the Legislature adopted a statute providing for cost of living increases for retired state legislators that was designed to replace the previous formula that had not proved effective in maintaining retirees' purchasing power. (*Allen*, *supra*, 34 Cal.3d at p. 118.) Effective January 2, 1967, the Legislature was changed to a year-round lawmaking body and legislators were given the power to set their own salaries, which had formerly been fixed by the state Constitution. (*Ibid*.) Legislative salaries jumped from $500 a month to $16,000 annually, with a proviso that this new salary would not be used to compute the pension benefits of any former legislator who had retired before that date. (*Ibid*.)

Former legislators who had served during the 1963–1965 term, but had retired before 1967 (and who had only worked as part-time legislators), obtained a writ of mandate from the superior court compelling the payment of benefits based on the $16,000 annual salary. (*Allen*, *supra*, 34 Cal.3d at pp. 118-119.) The Supreme Court

12

reversed. It reasoned that by implementing a cost of living allowance in 1963, the Legislature had extended relief to retirees in a manner that was then within its power, "accomplish[ing] directly what it no longer realistically could expect to occur as an incident of the original statutory scheme." (*Id*. at p. 121.) " 'The original law had held out to the covered employees a fluctuation provision whose theory and objective, whatever its literal means, was to sustain the living standard of the system's beneficiaries. This objective was now being met with a substitute formula, which tied the benefit amount to cost indices rather than current salaries. The sharp salary increase to $16,000 was not tied to the creeping progression of cost indices. Neither had it any relevancy to the retirement law's cost-of-living objective. That objective was being met by the substitute formula, and the 1966 restriction in no way obstructed it.' " (*Id*. at p. 122, citing *Lyon v. Flournoy* (1969) 271 Cal.App.2d 774, 785 (*Lyon*).) " 'The 1966 restriction preserved the basic character of the earned benefit but withheld a windfall unrelated to its real character.' " (*Allen*, at p. 122, citing *Lyon*, at p. 787.)

The retirees who sought the additional benefit in *Allen* had already been provided with a cost of living adjustment that gave them a superior benefit when compared with the previous system linking pension benefits with the current legislators' salaries. To give them the additional cost of living increase they sought based on the substantially higher salary that went into effect after the nature of the job had changed would have given the retired part-time legislators a significant unearned windfall. There is no comparable windfall in the present case, which requires us to determine the permissibility of a restriction on the existing supplemental COLA benefit, rather than an entitlement to an unforeseen increase in pension allowances. (See *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1036 [distinguishing *Allen* and finding contract clause violation in provision reducing state's obligation to fund a supplemental benefit maintenance allowance for retired teachers]; *United Firefighters*, *supra*, 210 Cal.App.3d at pp. 1107-1108 [retirees whose benefits increased when cost of living adjustment was uncapped did not receive a " 'windfall profit,' " but "only their due"].)

13

Nor did the " 'basic character' " of the supplemental COLA in this case include a full funding requirement based on the market value of the Fund. (*Allen*, *supra*, 34 Cal.3d at p. 122.) Excess earnings must be placed in the Reserve Fund and either used to pay a supplemental COLA or accumulated until the funds are sufficient to pay a supplemental COLA; until the supplemental COLA is paid, they cannot be used for another purpose. Were full funding such a basic component of the supplemental COLA, we would expect the Charter to contain a provision allowing the City to first use the excess funds to pay down any deficit in the Fund as a whole or to offset below-expected earnings in other years. That the Fund might have been fully funded when the supplemental COLA was implemented does not mean the supplemental COLA was contingent on full funding. (See *United Firefighters*, *supra*, 210 Cal.App.3d at p. 1106 [though property taxes had been used to fund cost of living adjustment, city could levy other kind of taxes and the reduction in property taxes following Proposition 13 did not justify reduction of the adjustment].)

F. Full Funding Was Not a Precondition to the Supplemental COLA Before 2011

The City argues full funding has been a condition of the supplemental COLA since its inception, meaning that when section A8.526-3(d) was amended as part of Proposition C in November 2011, it did not reduce that benefit. The City acknowledges none of the previously enacted charter provisions have expressly mentioned full funding as a condition of paying the supplemental COLA, but argues the ballot materials from prior elections show such a requirement was implicit.

When interpreting a law added by voter initiative, we look to its language as the best indication of the voters' intent. (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1172 (*Claremont*).) When that language is unambiguous, we presume the voters intended the meaning apparent on the face of the provision. (*Ibid.*) Extrinsic materials, such as analyses and arguments contained in the official ballot pamphlet, may be used to interpret ambiguous language or to confirm the plain meaning of the provision. (*Silicon Valley Taxpayers' Assn. v. Garner* (2013) 216 Cal.App.4th 402, 407; *Jenkins v. County*

14

*of Los Angeles* (1999) 74 Cal.App.4th 524, 530-531.) They may not be used to add to or rewrite the provision " ' "to conform to an assumed intent that is not apparent in its language." ' " (*Claremont*, at p. 1172.)

Given the absence of any reference to full funding in the 1996, 2002 and 2008 supplemental COLA provisions, the City's suggestion that we glean such a requirement from the ballot materials asks us to "employ legislative history in a manner beyond its capacity to shed light on the text of the statute." (*City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 790.) But, even if we look to the ballot materials to determine the voters' intent, we discern no intent to require full funding as a condition of paying the supplemental COLA.

### 1. 1996 Initiative (Proposition C)

We turn first to the ballot materials for Proposition C, the 1996 initiative that first enacted the supplemental COLA, which include a digest of the measure, the controller's statement, arguments for and against the measure, and paid arguments for and against the measure. The digest and controller's statement do not contribute to our analysis because they do not refer to full funding or the overall financial health of the Fund. (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 97.)

One of the opponents' arguments to the measure characterized the supplemental COLA as "[f]reely giving away public money" and compared it to the free-spending habits of Juan and Eva Peron when they controlled Argentina in the mid-20th century. In rebuttal, the Board of Supervisors made the following statement: "We should improve benefits for retired City Employees. It[']s fair. Retired City employees are living at the poverty level after a career of public service. [¶] . . . [¶] Proposition C provides a 3% cost of living adjustment for all retirees including police and fire—equal treatment for all retirees. [¶] Surveys of other public retirement systems show that this protection is a common and accepted plan feature. [¶] *The Retirement Fund is more than 100% funded. Proposition C does not change this.* [¶] *We can afford this help.*" (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 99, italics added.)

15

The paid arguments in favor of the 1996 initiative included the following statement: "Proposition C is fair to the retiree and to the City. [¶] Retired City employees are entitled to fairness. They dedicated themselves to serving the public. [¶] Inflation has eroded their purchasing power as much as 50%. Many of them receive $550 per month or less. [¶] They live below the poverty line. [¶] They were promised their benefits would be increased once the Retirement Fund was 100% funded. [¶] *Now, the Fund is more than 100% funded.* This year, the City pays 0%—NOTHING—into the Fund for uniformed employees and a minimal 1.83% for other employees while employees continue to contribute 7% or more of their pay into the Fund. [¶] Proposition C corrects the unfairness. [¶] . . . [¶] It's time to keep the promise!" (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 100, italics added.)

Although the quoted portions of the ballot materials refer to the Fund being fully funded, they do not suggest full funding is a condition of the proposed supplemental COLA. One of the paid arguments against the measure advised the voters the opposite was true: "Prop[osition] C is fiscally irresponsible. It is questionable business practice to funnel 'excess earnings' into a Reserve Account to fund additional benefits, as required by the legislation, *without specifying how to balance the general retirement fund in years of below-expected earnings.* The city controller projects that cost in 10 years would be about $24 million in 1996 dollars. Vote No on C." (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 101, italics added.)

From the arguments for and against the measure, the voters in 1996 would have understood that while the Fund was currently "100% funded," there was no provision requiring that excess funds be used to maintain that level of funding. This was the primary complaint of one of the opponents of the measure, which advised voters to reject the supplemental COLA precisely because the excess earnings should instead be used to balance the fund as a whole in years when earnings did not exceed expectations. (S.F. Voter Information Pamp. (Nov. 5, 1996) p. 98.) In light of the information provided in the ballot materials, we cannot say the voters intended the supplemental COLA to be contingent on full funding. Indeed, given that "full funding" for actuarial purposes is a

16

term of art not defined in the ballot materials, we cannot infer voters would have appreciated the difference between the fund's long-term ability to meet actuarial liabilities and its ability to meet its current obligations in a particular year.  (See *County of Orange v. Association of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 38, fn. 8 (*Orange*) [" ' "Over the years, the term 'unfunded liability' has created considerable confusion for the readers of actuarial reports.  The confusion arises when the term is thought of in the same manner as accounting liabilities.  That is, the connotation was that the money was 'owed' by the plan or somehow the plan was deficient.  The truth of the matter is that the 'past service liability' and the 'unfunded liability' are a function of the actuarial methods and assumptions used to fund a pension plan." ' "].)

### 2.  2002 Initiative (Proposition B)

Proposition B, which was passed in 2002, made the supplemental COLA permanent.  The ballot materials provided to voters included the following statement by the city controller:  "Should the proposed amendment be adopted, in my opinion, the cost to the City and County would increase, as estimated by the Retirement System Actuary, by about $19.1 million per year for the next 20 years, dropping after 20 years to an ongoing cost of approximately $7.4 million.  *However, no cash would be required since the City's Retirement System has a large surplus.*  While the cost of this proposal would reduce that surplus, the City nonetheless would not be required to make employer contributions to the Retirement System for approximately the next 15 years."  (S.F. Voter Information Pamp. (Mar. 5, 2002) p. 47, italics added.)  The proponent's argument in favor of Proposition B and the paid arguments in favor of Proposition B also referred to the then-existing surplus in the Fund.  (*Id.* at pp. 48, 50-52.)

An intent to condition the supplemental COLA on full funding cannot be gleaned from these ballot materials.  While voters were aware the Fund currently had a surplus, the language of the initiative itself provided that excess earnings placed in the Reserve Fund would be used to either pay the supplemental COLA or, if not sufficient to do so, accumulated until the supplemental COLA could be paid.  Because the text of

17

Proposition B made it clear the excess earnings in the Reserve Fund could not be used to offset other actuarial liabilities before making the supplemental COLA payments as provided, we cannot infer the voters intended to make such payments contingent on full funding. Ballot materials may be indicative of the voters' intent, but they may not be used to "nullify the language of the statute as it was in fact enacted." (*Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1193.)

### 3. 2008 Initiative (Proposition B)

Proposition B, passed in 2008, made significant changes to the funding of the health care system for retired employees. While it also increased the cap on the supplemental COLA, this was not the most prominent aspect of the measure. The ballot materials for Proposition B in 2008 devoted considerably more space to the health care amendments than to the supplemental COLA, and made no reference to full funding or a surplus. The voters were simply told the measure would raise the supplemental COLA from 3 percent to 3.5 percent, less the basic COLA, and allow for the incremental payment of the supplemental COLA when excess funds were insufficient to cover the maximum payment. (S.F. Voter Information Pamp. (June 5, 2008) pp. 98, 99.) Nothing in the 2008 ballot materials suggests the voters intended to condition the supplemental COLA on full funding.

### G. Section A8.526-3(d) Does Not Merely Clarify Existing Law

Taking a slightly different tack, the City suggests the 2011 initiative merely clarified the law as it already existed because the voters intended to condition supplemental COLA payments on full funding when they passed Proposition B in 2008. The City relies on the text of section A8.526-3(d), which states, "*To clarify the intent of the voters when originally enacting this Section in 2008*, beginning on July 1, 2012 and July 1 of each succeeding year, no supplemental cost of living benefit adjustment shall be payable unless the Retirement System was also fully funded based on the market value of the assets for the previous year." (S.F. Voter Information Pamp. (Nov. 8, 2011) p. 114, emphasis added.)

18

The 2008 initiative enacting section A8.526-3 raised the supplemental COLA from 3 percent to 3.5 percent and provided for incremental payments to be made in years when funds were not available for the full supplemental COLA. Thus, if the 2008 initiative is construed to impose a full funding condition for the supplemental COLA, that requirement could arguably be upheld because pensioners were given a "comparable advantage" in exchange. (*Betts*, *supra*, 21 Cal.3d at p. 864.)

Was the 2011 amendment simply a clarification of the 2008 initiative measure? The task of answering that question, and with interpreting legislation in general, rests with the courts, not the legislative branch of government. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 472 (*McClung*).) When courts have not yet finally and conclusively interpreted a provision, "a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration" and may be properly examined together with other factors to determine the legislative intent existing when the prior act was passed. (*Id.* at p. 473; see *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244; *Eu v.* Chacon (1976) 16 Cal.3d 465, 470.) Such a declaration, however, " 'is neither binding nor conclusive.' " (*McClung*, at p. 473.) The same principles apply when interpreting a voter initiative. (*People v. Superior Court (Cervantes)* (2014) 225 Cal.App.4th 1007, 1014.)

"A declaration that a statutory amendment merely clarified the law 'cannot be given an obviously absurd effect, and the court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms.' " (*McClung*, *supra*, 34 Cal.4th at p. 473.) Even if we accept the City's assertion that the "clarification" language of section A8.526-3(d) is entitled to a presumption of validity (see, e.g., *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1102), that presumption has been rebutted in this case.

For the reasons previously discussed, nothing in the text or ballot materials of the 2008 initiative can be construed to tether the supplemental COLA to full funding. The bulk of the 2008 initiative concerned retiree health benefits and additionally increased the cap on the supplemental COLA by half a percent. The ballot materials from 2008 do not

19

mention full funding, and there is no indication that issue was on the voters' radar at all. There having been no requirement of full funding when the voters passed the 2008 initiative, Proposition C effected an "unmistakable change" in 2011 when it amended section A8.526-3(d). (*McClung*, *supra*, 34 Cal.4th at p. 473.) This aspect of the measure cannot be upheld on the theory section A8.526-3(d) is merely a clarification of existing law.

H. Section A8.526-3(d) May Be Applied to Employees Who Retired Before November 6, 1996

SFERS pension benefits did not include a supplemental COLA until voters approved the addition of section A8.526-1 to the Charter in the election held November 5, 1996. This provision was effective and operative on November 6, 1996. (See Cal. Const., art. II, § 10, subd. (a) [initiative measure approved by majority of voters takes effect the day after the election unless the measure provides otherwise]; *Thompson v. Board of Supervisors* (1986) 180 Cal.App.3d 555, 562, fn. 5 [rules regarding construction of statutes apply to construction of local ordinances].) The City argues that even if section A8.526-3(d) is construed to impair the contractual rights of current employees and employees who retired on or after the effective date of the supplemental COLA, employees who had previously retired did not have the same vested rights. We agree.

First, we reject POB's contention the City has forfeited the right to challenge the vested right claims of pre–November 6, 1996 retirees by failing to raise the issue as an affirmative defense in its answer to the petition for writ of mandate. (See *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 424 [affirmative defense must be pleaded and proved].) "An affirmative defense is an allegation of new matter in the answer that is not responsive to an essential allegation in the complaint. . . . Where the answer alleges facts showing that some essential allegation of the complaint is not true, those facts are not 'new matter,' but only a traverse." (*Bank of New York Mellon v. Preciado* (2013) 224 Cal.App.4th Supp. 1, 8.) Here, POB alleged in its petition that all City retirees and current employees had a vested right in the supplemental COLA; the

20

vested nature of the right held by former employees who retired before November 6, 1996, was an essential element of POB's causes of action and the City was not required to separately plead the status of those retirees as an affirmative defense.

Turning to the merits—whether employees who had already retired had a vested right in the later-enacted supplemental COLA—a similar issue was addressed in *Claypool v. Wilson* (1992) 4 Cal.App.4th 646 (*Claypool*). In that case, the court considered a challenge to a state law repealing a supplemental cost of living adjustment available to retired state employees and replacing it with a new supplemental cost of living adjustment. (*Id.* at pp. 652-659.) With respect to employees who had retired before the former supplemental COLAs went into effect, the court found no vested contractual rights were at issue. "The contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute. [Citation.] A member whose employment terminated before enactment of a statute offering additional benefits does not exchange services for the right to the benefits." (*Id.* at p. 662; see *Olson v. Cory* (1980) 27 Cal.3d 532, 542 [judicial pensioners whose services terminated before effective date of law providing for unlimited cost of living increase had no vested right to that benefit, though pensioners whose benefits were based on the salary of sitting judges who were entitled to increase were also entitled to increase]; *Retirement Cases*, *supra*, 110 Cal.App.4th at p. 447 [right to pension is "defined by the benefits and law in place when an employee is rendering services, not by changes that occur after retirement"].)

The court's conclusion in *Claypool* is consistent with *Pasadena Police*, *supra*, 147 Cal.App.3d 695, in which the court considered the effect of a charter amendment that capped a formerly uncapped cost of living adjustment on city pensions. (*Pasadena Police,* at pp. 700-701.) With respect to current employees, the court found the amendment impaired a vested contractual right that was not offset by a comparable benefit (*Ibid.*) With respect to employees who had retired before any cost of living allowance went into effect, there was no vested right based on the contract in effect during their employment: "Since these members had completed all their years of service and retired before any COLA benefit was enacted, they never gave services with the

21

reasonable expectation that their pensions would be adjusted for changes in the cost of living." (*Id*. at p. 706.) However, because these retirees had later given up other benefits to opt into a modified pension plan that included the supplemental cost of living allowance, they had provided the consideration giving rise to a new contractual right to the supplemental cost of living adjustment. (*Id*. at p. 707.) POB has not directed us to any subsequent contract that might entitle employees who retired before November 6, 1996, to a cost of living allowance such as that in *Pasadena Police*.

POB cites a number of decisions for the proposition that a pensioner's benefits may be increased after retirement based on services previously rendered. (*Sweesy v. L.A. etc. Retirement Bd.* (1941) 17 Cal.2d 356, 359-363 (*Sweesy*); *Orange*, *supra*, 192 Cal.App.4th at p. 43; *Nelson v. City of Los Angeles* (1971) 21 Cal.App.3d 916, 919 (*Nelson*); *Brummund v. City of Oakland* (1952) 111 Cal.App.2d 114, 121 (*Brummund*).) None of these authorities hold that an employee who has already retired has a vested right to a subsequently enacted increase in pension benefits, and POB has cited no case standing for this proposition.

In each case cited by POB, a law had been passed that either increased pension benefits for employees who had already retired or gave current employees an improved pension benefit based on services already rendered. The courts rejected arguments that such benefits amount to a gift of public money in violation of the state constitution. (Cal. Const., art. XI, § 10; *Sweesy*, *supra*, 17 Cal.2d at pp. 359-363 [expansion of widow's benefits were expressly stated to apply retroactively and did not amount to a gift]; *Orange*, *supra*, 192 Cal.App.4th at pp. 29-30, 39-48 [more advantageous retirement formula of "3% at 50" was not a gift of public money though formula was applied to past years of service]; *Nelson*, *supra*, 21 Cal.App.3d at pp. 917-919 [increase in minimum pension payment not gift of public money when applied to persons already receiving a pension]; *Brummund*, *supra*, 111 Cal.App.2d at pp. 116-117, 121 [widow's right to refund of moneys deducted from husband's pay and contributed to pension fund could be applied retroactively to deductions made before right to refund went into effect].) " 'The law is well settled that additional benefits may constitutionally be provided for members

22

of the [retirement] system who have acquired a pensionable status.' [Citation.] Inherent in the statement of the settled principle is the rationale that an increase in pension benefits payable to a retired public employee or his widow on pensionable status is paid as the result of rights incident to that status and not as a matter of increased compensation or allowance." (*Nelson*, at pp. 918-919.)

The courts in these cases upheld laws that were designed to increase benefits for existing pensioners (or for employees who had already performed the services necessary for the benefits to apply), against a claim the benefits were a gift of public money. They did not address whether those increased benefits were a vested right or discuss the degree to which the laws could later be amended without violating the pensioners' rights. To say that benefits *may* be increased after retirement is much different than saying a retired employee has a *vested* right to an increase in benefits conferred after retirement; as explained in *Claypool*, such employees have not exchanged services for the right to benefits and have no claim under the contract clauses. (*Claypool*, *supra*, 4 Cal.App.4th at p. 662.)

POB notes that since 1950, the voters of San Francisco have increased the pensions of City retirees a number of times, suggesting that any law reducing benefits for current pensioners would be contrary to the voters' intent. While voters have indeed approved pension increases for retirees in the past, in 2011 they obviously intended to place a limit on the supplemental COLA. We have concluded this limitation cannot be constitutionally applied to current employees and those who retired after the initial enactment of the supplemental COLA in 1996, but this does not mean it impairs the contractual rights of employees who retired before the supplemental COLA went into effect. Such pre-1996 pensioners had a vested right to the pension benefits that were in effect when they retired, having earned such benefits as an element of compensation, but they had no contractual expectation while in service that they would receive a supplemental cost of living allowance. (See *Betts*, *supra*, 21 Cal.3d at pp. 863, 866.)

City employees who retired before Charter section A8.526-1 went into effect on November 6, 1996, are in the same position as the retirees in *Claypool*. The City may,

23

without violating vested contractual rights, apply section A8.526-3(d) to these employees and condition their supplemental COLA benefits on full funding.

I. Actuarial Report

Charter section A8.500 gives the Board of Supervisors the power to enact "ordinances necessary to carry into effect" the Charter provisions dealing with SFERS, "provided that the Board of Supervisors shall secure, through the Retirement Board, an actuarial report of the cost and effect of any proposed change in the benefits under the Retirement System, before enacting an ordinance or before voting to submit any proposed Charter Amendment providing for such change." POB argues section A8.526-3(d) was invalid because the Board of Supervisors placed Proposition C on the ballot in November 2011 without securing an actuarial report as required by the City Charter. We disagree.[6]

An initial draft of the proposed 2011 amendment to section A8.526-3(d) provided the supplemental COLA could only be paid when the Fund was fully funded using an actuarial method of valuation. Cheiron, Inc. (Cheiron), the independent actuary retained by the SFERS, prepared a written report dated June 22, 2011, entitled "Estimated Cost Impact of City Charter Proposal." The report discussed the estimated cost impact of each aspect of Proposition C, including the changes to the supplemental COLA, and included tables showing the results of "stochastic model[ing]" simulating "500 investment return scenarios over the next 30 years" to estimate the amounts the City would need to contribute to the Fund. The analysis was "based on the data, methods and assumptions described in the July 1, 2010 actuarial valuation report. To estimate the ultimate impact of the changes, we compared the current population under the current provisions to the same population under the proposed provisions assuming they had always been covered under the proposed provisions. Essentially, we assume that the plan population when all

---

[6] Because we have held section A8.526-3(d) may not be constitutionally applied to current employees and employees who retired after November 6, 1996, when the supplemental COLA became operative, this aspect of our discussion affects only those employees who retired before the supplemental COLA went into effect.

24

active members are covered by the new provisions is the same demographic mix (age, lengths of service, etc.) as the current population."

The report was forwarded to the Board of Supervisors, which amended the proposed amendment to section A8.526-3(d) to require that the Fund be fully funded based on the market value, rather than the actuarial value, of the assets. SFERS asked Cheiron to prepare a report based on the market value of assets, and Cheiron issued a second report, entitled "Estimated Cost Impact of City Charter Proposal—2d Revision." The report, dated June 29, 2011, notes: "This estimate reflects the alternative from our estimate dated June 27 [*sic*], 2011 to include the change in the proposed restriction on the payment of the Supplemental COLA to be based on the *market value of assets* instead of the actuarial value of assets." (Italics substituted for boldface in original.) Like the first report, it adopted the data, methods and assumptions of the most recent actuarial valuation and included tables showing the results of simulating 500 investment scenarios to estimate the City's contributions to the Fund. This report was forwarded to the Board of Supervisors, which unanimously voted to place the most recent version of Proposition C on the ballot.

POB has not established the reports prepared by Cheiron and provided to the Board of Supervisors were insufficient to satisfy Charter section A8.500. Section A8.500 does not further define "an actuarial report of the cost and effect of any proposed change in the benefits under the Retirement System." Cheiron was an actuary, and its reports on Proposition C summarize the costs and effect of that measure. There is no requirement in section A8.500 that the actuarial report, which is designed to inform the Board of Supervisors of the likely financial impacts of a measure, be as detailed as the annual actuarial valuation provided to the Retirement Board, which serves a number of additional purposes.

Even if we were to conclude the actuarial reports prepared by Cheiron were not of the detail contemplated by Charter section A8.500, it does not follow that section A8.526-3(d) should be invalidated on that basis. California courts have been most reluctant to overturn the results of an election based on a procedural defect in placing a

25

measure on the ballot once the election has been held and the voters have spoken. (See *Costa v. Superior Court* (2006) 37 Cal.4th 986, 1006-1007 ["defect that has occurred at the petition-circulation stage . . . ordinarily will have no effect on the material that is before the voters or on the fairness or accuracy of the election result"]; *Lenahan v. City of Los Angeles* (1939) 14 Cal.2d 128, 132 [procedural defect in initiative or referendum measure moot after election]; *Chase v. Brooks* (1986) 187 Cal.App.3d 657, 662 [where ballot measure and accompanying material adequately informed the electorate of the breadth and contents of referendum, violation of statute requiring particular caption language and complete text of ordinance was moot]; *Long v. Hultberg* (1972) 27 Cal.App.3d 606, 608-609 [when fairness of election not attacked, challenge to sufficiency of recall petitions is moot].)

POB has not identified any defects or omissions in the actuarial reports reviewed by the Board of Supervisors that even arguably resulted in an unfair election. Although POB has complained that section A8.526-3(d) was misleading to the extent it stated the full funding requirement was a clarification of existing law rather than a change in the law, this aspect of the measure has nothing to do with the actuarial reports reviewed by the Board of Supervisors.

## III.  DISPOSITION

The judgment (order denying POB's petition for writ of mandate) is affirmed in part and reversed in part. The matter is remanded to the trial court with directions to enter a new judgment consistent with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

NEEDHAM, J.

We concur.

JONES, P. J.

SIMONS, J.

(A140095)

San Francisco County Superior Court Case No. CPF13512788, Richard A. Kramer, Judge.

Clisham & Sortor, David P. Clisham, William H. Sortor and Justine L. Clisham for Appellant.

Law Offices of Donald T. Ramsey, Donald T. Ramsey for Appellant.

Davis, Cowell & Bowe, W. David Holsberry for Retired Firemen and Widows Association of the San Francisco Fire Department as Amicus Curiae on behalf of Appellant.

Dennis J. Herrera, City Attorney, and Wayne K. Snodgrass, Deputy City Attorney, for Respondent.

(A140095)